Desmond, Ch. J.
Appellant has been convicted of murder in the first degree and sentenced to death for the killing of Michael Errichiello on the early morning of December 26, 1951. He was convicted at the same time for the attempted murder of one Boceo Tisi. An appeal from that latter conviction is pending in the Appellate Division, First Department, and is not before us at this time.
About 5:00 o’clock on the morning of December 26, 1951, police officers were called to a place known as the Mayfair Social Club on the ground floor of a building on Mulberry Street in Manhattan, an enterprise which had been conducted by defendant and the victim Errichiello as partners. When the officers arrived defendant was standing in front of the place and pointed through the door to the body of the victim who had been shot to death and was lying slumped in a chair. The police questioned defendant but did not arrest him and when they went looking for him later he was not to be found. As a result of later investigations he was indicted, about a month after the killing. Defendant remained away from New York until, pursuant to *547 arrangement made by his lawyer, he voluntarily surrendered to the police or the District Attorney.
The incriminating evidence against defendant at the trial came almost entirely from the witness Boceo Tisi who testified that about 4:30 on the morning of the killing he went alone to the club and that as he entered it he saw defendant and a couple of others standing just outside. Tisi testified that when he entered the club he saw Errichiello asleep in a chair and an employee of the club (one “ Pretty Willie ”) sitting nearby, that the witness talked to the employee, and that both of them started to leave the place about 5:00 o’clock but as they started out the door defendant walked in with Indelicate and a third man who was not identified. Tisi’s testimony was that defendant told the employee to leave the place and the latter did; that defendant then fired the fatal shots into the body of Errichiello; that Indelicate at defendant’s urging tried to shoot the witness but his revolver misfired; that there was then a fight with Indelicate during which the latter hit the witness with the gun and the witness broke a bone in his left leg or ankle but managed to hop out of the building and hide nearby until Indelicate and the defendant left the scene. Police officers testified that an hour or so after the killing they went to a hospital where they questioned Tisi who told them that three men unknown to him had come into the club and announced a stickup and that one of them had shot the deceased. One of these officers testified, as to defendant, that on the afternoon of the killing he gave them a statement describing his movements on the night of December 25-26 and stating that he had gone to the club about 5:00 o ’clock in the morning, had entered and seen the decedent’s body and had then gone out and called the police. The officers said that defendant had been told to return to the police station later that day, that he never came back, and that they were unable to find him despite efforts that extended for several years.
In his first point on appeal defendant argues that his guilt was not established beyond a reasonable doubt. He points out that the clothing worn by defendant when the police came to the club early that morning was quite different from the description which Tisi gave them of the clothing of the killer and that there are other discrepancies in Tisi’s various statements. Defendant *548 makes much of the strange fact that Tisi’s own brother testified at the trial that Tisi’s reputation for untruthfulness was very bad and that he would not believe his brother under oath. While the weight of evidence is, of course, open to our review on an appeal like this, we do not see how we could come to the conclusion that this testimony was not sufficient for a conviction. Any doubt as to the witness Tisi’s untruthfulness was for the jury to resolve.
Defendant argues that it was prejudicial for the prosecution to force the witness Luparelli to testify despite the witness’ assertion of his privilege against self incrimination and afterwards to impeach the witness. When first called to the stand, Luparelli consistently and emphatically refused to answer any questions on the ground that the answers would tend to incriminate him. It appeared that he had been confined in jail for some time as a material witness in the cause and that he had made unsuccessful efforts to get an attorney to advise him of his rights. In open court he refused the court’s offer to assign an attorney to him. A pretrial statement made by him seven weeks after the killing was not admitted into evidence but is in the record as an exhibit for identification. This witness, who was illiterate or nearly so, was about 15 years old at the time of the killing and had been at a movie, that night and until some time before the killing, with the deceased and the alleged eyewitness Tisi. The District Attorney prodded Luparelli with questions as to whether he had seen defendant in front of the club at about 4:00 o’clock on the morning of December 26th and as to whether he had gotten a package in a paper bag from the defendant at that time and place. He continued to refuse to answer although the court insisted that these were not questions the answers to which would tend to incriminate him. Court was adjourned until the following day and Luparelli again took the stand. At the next day’s session of court he no longer asserted his privilege against testifying but answered most questions by saying that he did not remember. The result of all this was that he gave no testimony directly damaging to defendant but, of course, his attitude may have produced an impression on the jury unfavorable to defendant, especially since some of the unanswered questions suggested things highly unfavorable to the latter. As Luparelli left the stand the court, on motion of the defense, instructed the *549 jury not to consider any of the questions or answers put to the witness from the alleged statement and not to draw any inferences from any of the questions or answers since the witness had said that he did not remember.
Defendant argues that Luparelli’s appearance on the stand and the somewhat emotional references to the incident in the prosecutor’s summation were highly prejudicial to defendant, especially as they presented or suggested a picture of “ neighborhood ” people protecting each other out of fear or loyalty. After the trial and conviction defendant, through newly retained counsel, moved in arrest of judgment and for a new trial on the grounds that the prosecutor had made improper use of Luparelli’s claim of constitutional privilege when the prosecutor knew in advance that the witness would claim the privilege and, second, that the prosecutor had knowingly put before the jury the alleged statement- by Luparelli which the prosecutor had reason to know had been obtained by threats, force and fraud practices on the witness. A hearing was held on this motion before sentence and the court, after taking testimony, held that no grounds were shown for impeaching the verdict. At that hearing the Assistant District Attorney who prepared and tried the case took the stand and denied that Luparelli had announced in advance of the trial that he would claim his privilege. This whole Luparelli matter may have resulted in unfairness of a sort to defendant but we can see nothing in it which would justify a reversal of the conviction.
We come now to what appears to us to be the important question in the case. Defendant, indicted in 1952, surrendered, in the company of his attorney or at least by arrangement with his attorney, in August, 1958. At the District Attorney’s office defendant was then questioned by several police officers and an Assistant District Attorney but in the absence of his own lawyer. The record does not seem to show how long this questioning lasted. At the trial Detective Talty was permitted to testify to the statements made by defendant although the defense objected on the ground that questioning after indictment and after surrender for arraignment and trial was improper. Defendant, during this questioning, made no admissions of guilt but he did describe his business and personal relationship with the deceased and stated that he knew Tisi, Indelicate and “ Pretty Willie ”. *550 During this questioning in the District Attorney’s office he said that he had been very drunk at the time he came into the club and found deceased and called the police. He admitted that there had been a ‘ ‘ misunderstanding ’ ’ between him and the deceased which admission may have been important since there was nothing else in the record as to motive. He also admitted (along the same line) that he had not gone to the decedent’s funeral. More importantly, he admitted that about two weeks after the killing, when he learned that the police were looking for him “ relative to the homicide ”, he left town, stayed away for seven years and never communicated with his wife or family because “ he could have been traced by the Police Department ”. This was an admission of importance because it corroborated the prosecution’s claim of flight.
In Spano v. New York (360 U. S. 315) the United States Supreme Court, reversing this court (4 N Y 2d 256), held that a conviction was improper and had to be set aside because a confession had been gotten from the defendant by police officers by means of long and unfair questioning after defendant had been indicted and had surrendered himself. A majority of the United States Supreme Court based the reversal on the ground that the confession, obtained by pressure, fatigue and falsely aroused sympathy, had been involuntary, especially since defendant had been refused access to the attorney who surrendered him and who had instructed Spano not to answer. The Chief Justice, in writing the majority opinion, said (p. 320) that he found it unnecessary to pass on defendant’s contention that ‘ ‘ following indictment no confession obtained in the absence of counsel can be used without violating the Fourteenth Amendment ”. The Supreme Court majority, therefore, did not directly decide that question. Four Justices, however, in two opinions, strongly took the position that after indictment the right of an accused to the assistance of an attorney is absolute and that questioning him after indictment in the absence of his attorney is a violation of his right to counsel. This latter position is the one some of us took in dissent when the case was here (People v. Spano, 4 N Y 2d 256, supra). In view of what happened in the Supreme Court we do not think we are concluded by this court’s decision in Spano. We think this questioning was a violation of this defendant’s constitutional rights *551 and that the admission in evidence, over objection, of his admissions made during that questioning after indictment and surrender for arraignment was so gross an error as to require reversal, regardless of any other question in this case.
This was testimonial compulsion (see People ex rel. Ferguson v. Reardon, 197 N. Y. 236, 242; People v. Defore, 242 N. Y. 13, 27; People ex rel. Kenny v. Adams, 292 N. Y. 65, 70, 71).
The judgment should be reversed and a new trial ordered.