Argued December 14, 1960, reversed and remanded
March 1, 1961

# STATE OF OREGON *v.* KRISTICH

359 P. 2d 1106

*Carl H. Francis,* Dayton, and *George H. Layman,* Newberg, argued the cause and filed briefs for appellant.

*James E. Craig,* District Attorney, McMinnville, argued the cause and filed a brief for respondent.

Before McAllister, Chief Justice, and Rossman, Warner, Perry, Sloan, O'Connell and Goodwin, Justices.

SLOAN, J.

Defendant was charged and convicted of violating ORS 163.220 in that he committed rape upon his wife's 13-year-old daughter. He appeals from the judgment which followed the verdict of guilty.

During the course of the trial the alleged victim was

permitted to testify, over objection, to other acts of intercourse with defendant and to the birth of a child. Each of the items mentioned is the subject of a separate assignment of error. The problem is the same in respect to each assignment and we will treat them together.

This court has repeatedly held that in crimes involving illicit sexual acts evidence of other similar acts between the same persons is admissible. *State v. Howard,* 1958, 214 Or 611, 331 P2d 1116; *State of Oregon v. Risen,* 1951, 192 Or 557, 235 P2d 764; *State v. Ewing,* 1944, 174 Or 487, 149 P2d 765. Amongst other reasons assigned it has been said that such evidence is admissible to show an inclination to perform the act and to corroborate the testimony of the alleged victim as to the specific act charged.

The defendant here seeks to overcome these and similar cases by citation to a critical analysis of some of the reasoning found in the cases made by Professor F. R. Lacy in an article at 31 Or L Rev 267 (1952). The argument made by defendant's counsel, both orally and by brief, requires us to re-examine the rules relating to evidence of other offenses in a case of this character. In doing so it is not our purpose to disturb the ultimate rule that in a given case evidence of similar acts can be admissible. It is our purpose to consider why the evidence of other sexual misconduct between defendant and the victim was admissible in this case. In doing so it is necessary to re-examine the tests of admissibility. The real quarrel with some of the cases arises from the failure of the court to consider if the reasons for admitting evidence of other acts outweighs its obvious prejudicial character.

In the trial of this case the state elected to prove

that the specific act of rape for which defendant was charged occurred within certain hours of the day of January 12, 1958. It was the truth or falsity of that charge which was decisive of guilt or innocence. As the alleged act was described by the victim, she was a willing, if not a cooperative, participant. She testified that in addition to this particular act she had engaged in other acts with defendant as often as once or twice a week for several months both before and after the event charged. The course of conduct had its inception by a seductive process during which, so she testified, defendant first fondled her and eventually gained access. The details we have omitted. There was no evidence of any resistance on her part nor that she ever informed her mother, defendant's wife, until she became pregnant. She also testified that she had not had intercourse with any other person and was permitted to tell of the birth of a child at a time when the alleged rape on January 12 could not possibly have been the cause of conception. This is the character of the evidence that is said to be so prejudicial to defendant that it was error to admit.

In order to test the admissibility of the evidence of the alleged seduction of the girl and of the other acts of sexual intercourse, it is necessary to consider the precise nature of the immediate act alleged to have occurred on January 12. It was said to have occurred at a house defendant had purchased as a family home. The house was in the process of being remodeled. Defendant and family did not occupy the house at the time but lived elsewhere. The victim testified that on January 12, 1958, a Sunday, she and defendant and a younger brother and sister of hers had gone to the house for a clean-up operation of construction debris. That while there defendant took her to an unfurnished

bedroom, placed her on a stack of plasterboard, removed part of her clothes and part of his own, indulged in the act of intercourse without further ado, redressed, and proceeded about the work. It would have been contrary to all accepted standards of normal conduct for the act to have taken place as an isolated event that had never occurred before. As described by the girl, the act required knowledge of what was expected; understanding and a willingness, if not a desire, to cooperate. Even young girls simply do not so voluntarily surrender to such a relationship unless there has been force or seductive persuasion. The latter does not usually occur while walking from one room to another. We will revert to this in a moment.

To decide if it was error to admit the questioned evidence it is necessary to consider: Was there sound reason to admit it; was it unduly prejudicial?

■ The true test to determine the admissibility of any evidence is that of relevancy. Wigmore says that there are two axioms which underlie the whole structure of evidence. The first is that "None but facts having rational probative value are admissible." The second: "All facts having rational probative value are admissible, unless some specific rule forbids." I Wigmore, Evidence (3rd ed, 1940) ch II, p 289, p 293. McCormick, Evidence, 1954, ch 16, p 314, adopts the same thesis and quotes Thayer, Preliminary Treatise on Evidence, (1898) in support. The writers and many courts are now convinced that there will be less confusion in testing the admissibility of evidence if the simple rule of relevancy is the test rather than a mechanical process of applying rules of restriction and exceptions thereto. See cases and comments in Morgan and Maguire, Cases and Materials on Evidence, 1951, p 158 et seq., particularly the well-reasoned opinion in

*State v. Scott,* 1947, 111 Utah 9, 175 P2d 1016, quoted at *op. cit.* 161.

Professor Lacy suggests a determination of relevancy by the process of asking these questions: What must this party show? What does this evidence tend to show? And will this evidence influence the jury out of all proportion to its logical tendency to prove a fact in issue? 31 Or L Rev, *supra,* p 296. The merit to the questions posed can be seen when applied to the case at hand.

It was, of course, necessary for the state to prove the act charged. If the act had been accomplished by force or some coercive process against resistance it perhaps would have been immaterial to the jury's understanding of the case to have limited the evidence to the one act complained of. Forcible rape at a given time and place need not require a background of previous conduct to make the act believable. Here, however, as we have already pointed out, it would have been an unnatural and thus unbelievable story to have described only the particular incident without some background to explain the victim's ready acquiescence. So the state was obliged to show why the act could occur in the manner charged. The evidence was part and parcel of the crime actually charged.

Wigmore says that in respect to statutory rape: "The evidence may be dealt with from the point of view of adultery and fornication * * * where the intercourse was in fact voluntary; or it may be dealt with from the point of view of rape, where it was in fact forcible." II Wigmore, Evidence (3rd ed, 1940) § 402, p 370. As a part of his discussion of adultery he quotes this language from a perceptive opinion by the Vermont court written in 1876:

"The offense charged in this case cannot, ordi-

narily, be committed till the restraints of natural modesty and the safeguards of common deportment and conventionality have been overcome by gradual approaches, and the relations of the parties have been changed from those usually existing between the sexes, to the most intimate * * *. Thus it appears that the true relation of the parties to each other in this respect, is very material and proper to be shown * * *." *State v. Bridgman,* 49 Vt 202, 210; II Wigmore, *supra,* at p 366.

McCormick, *supra,* at p 328, says that evidence of other acts may be admitted to "complete the story of the crime on trial by proving its immediate context of happenings near in time and place" and also to "prove the existence of a larger continuing plan [or] scheme * * *." Both of which were pertinent to the instant case. But McCormick warns, however, that it is not possible to precisely delineate all of the purposes for which evidence of other offenses may be admitted, "for the range of relevancy outside the ban is almost infinite; * * *." *op. cit.,* p 327.

■ In this case the probative relevance of the evidence over balanced the prejudice the evidence may have created. It was almost directly aimed at the actual crime charged. The explicit instructions of the distinguished trial judge clearly segregated this evidence from that necessary to prove the actual crime. *State v. Howard, supra,* 214 Or at p 617. We cannot sustain the assignment.

The evidence in respect to the birth of the child presents a difficult question. This court has previously said the evidence is admissible. *State v. Robinson,* 1897, 32 Or 43, 48 P 357. In this case the evidence has corroborating value to the testimony of the girl. It was relevant to show the relationship between

the girl and defendant. And, like any other evidence which tends to establish guilt, it could have been disproved or used as a means of impeaching the veracity of the witness, if any such evidence were available. For the reasons previously stated we think it was not error to admit the evidence.

A further assignment involves the admission into evidence of oral statements made by defendant to police officers and others. It is claimed that the statements were made by defendant at a time when he was confined under arrest on another charge and when he was emotionally disturbed. The real challenge, however, to the admissions was that at the time defendant was represented by counsel. It is argued that the officers should not have questioned defendant without counsel being present; that to do so may render the statement inadmissible. Again, the careful manner in which this assignment is presented requires review of the question.

State courts of final review must now be conscious of the increasing disposition of the Supreme Court of the United States to treat any failure to provide an attorney at all stages of the criminal process following arrest as a violation of constitutional rights. *Spano v. New York,* 1959, 360 US 315, 79 S Ct 1202, 3 L Ed2d 1265. In the *Spano* case the majority opinion is not based on the failure to permit the defendant to see his attorney while being questioned by police officers. The majority held the use in evidence of a confession obtained after hours of grueling questioning, was, of itself, a violation of constitutional rights. However, the concurring opinions in that case and the dissenting opinions in *Crooker v. California,* 1958, 357 US 433, 78 S Ct 1287, 2 LEd2d 1448, and in *Cicenia v. LaGay,* 1958, 357 US 504, 78 S Ct 1297,

2 L Ed2d 1523, make it clear that at least four of the present court consider it a violation of constitutional rights for police officers to persist in grueling an accused after indictment for a crime when he asks to see his attorney. The New York Court of Appeals, by a divided decision, following the reversal of that court in the *Spano* case, *supra,* has now held that it violates constitutional rights to question an accused after arrest when he asks for his attorney. *People v. DiBiasi,* 1960, 7 NY2d 544, 166 NE2d 825.

We are not prepared to follow the New York Court, able and authoritative as its decisions are. This court has held, without explanation, that the "fact that defendant was without legal counsel, while being questioned by the officers, does not render his statement inadmissible." *State v. Layton,* 1944, 174 Or 217, 231, 148 P2d 522. That statement does not mean that the inability of an accused to consult counsel could not vitiate a confession made to questioning officers. The cases previously cited were aggravated cases in which the accused had been questioned for long hours and denied access to counsel when he asked for that right. With the exception of the *DiBiasi* case, the inability to see an attorney was one reason assigned for declaring an admission to be involuntary. We think each case must be examined to determine if a failure to provide or to permit an accused to consult counsel in existence would have violated constitutional rights or otherwise impaired the voluntary character of an admission. Therefore, we must consider the facts in this case.

Defendant was questioned by the officers for a period of about two hours. He made the statements first to one officer, then repeated them to a second one and, finally, at defendant's request, to a deputy dis-

trict attorney. At that point he was requested to make a tape recording of his statement. Before doing so, however, he was asked about his attorney and when defendant requested an opportunity to consult with the attorney, the questioning ceased.

■ Prior to the day of this questioning his wife had filed divorce proceedings against defendant. On the day of the questioning, and immediately preceding it, the wife had visited defendant at the jail and there is some evidence that the visit was emotionally disturbing to one or both of them. But it does not appear that this disturbance was an inducement to the admissions made. There is nothing in the record to indicate the statements were not voluntary or true. There is no claim of coercion or threat and no evidence of any. The true test is: Was the confession voluntary and was it true? Was the defendant motivated to tell the truth? *State v. Nunn,* 1958, 212 Or 546, 321 P2d 356. The United States Supreme Court has added the additional test that the method of procuring a confession must not exceed the limits of due process. *Spano v. New York, supra,* 360 US 315. In this case there was no conduct of the questioning officers which requires examination of constitutional limitations.

Defendant did not deny the truth of the statements it was said that he had made. The statements did not admit the offense for which he was tried in this case. They were not a confession of guilt. The statements did describe the alleged seductive process by which he induced the girl to engage in sexual acts with him. The officers testified that he admitted acts other than the one charged.

■ This case does not present the problem that may be raised when a confession is obtained before an accused has had any opportunity to consult with an at-

torney. We must, and do, recognize that an accused person's rights can be irreparably violated prior to trial as well as during actual trial. The Report on Lawlessness in Law Enforcement made by the National Commission on Law Observance and Enforcement (the Wickersham Committee) published by the United States Printing Office, 1931, was one comprehensive study of third-degree methods practiced at that time. The report reveals that many police departments practiced methods that violated constitutional rights. To what extent violations may occur in Oregon we cannot know. A court is ill-equipped to fully resolve such problems, particularly in respect to when and by what process an attorney should be provided for an accused and to what extent police officers should be restrained from questioning one arrested and confined for the commission of a crime in the absence of an attorney. In England the police are not allowed to ask more than perfunctory questions after arrest. Phipson, Evidence (9th ed, 1952) ch 21, pp 268, 270. McCormick, Evidence, *supra,* pp 240-241.

These problems require legislative study and solution. We can only say that it is now clear that criminal convictions may be jeopardized on appeal by the failure to provide or permit access to counsel at preliminary stages of the criminal process as well as upon trial. *People v. DiBiasi, supra,* 7 NY2d 544; Beaney, Right to Counsel, 1955, University of Michigan Press; Fellman, *The Federal Right to Counsel in State Courts,* 31 Neb L Rev 15 (1951). We can only decide each case upon the merits presented. The arguments made to induce this court to adopt the rule now accepted by the New York Court of Appeals could leave undecided many questions that can only be answered by the legislature. There is no showing in this case that defend-

ant's statements were less voluntary or true because of the absence of an attorney. We can only resolve this particular case and we find no error in admitting the officers' testimony.

We come now to the last assignment, a difficult one. It requires a new trial. The assignment charges misconduct of the bailiff in respect to remarks made to the jury. To consider the assignment we must look to the facts.

In the trial of the case the jury retired about 11:30 a. m. After deliberating through the afternoon the jury was taken to a restaurant for dinner at some unspecified hour. During the course of the dinner one of the jurors asked the bailiff if it were necessary for them to reach a verdict. The bailiff was said to have replied that it was; that defendant had been tried once before and therefore it was necessary to arrive at a verdict. The actual words used, of course, cannot be determined from the affidavits filed with accuracy. It is clear that there was discussion of the subject. Some of the jurors swore that the comments were made in jest. Most of the jurors heard the statements made. None of them admitted that it had influenced him or her in reaching a verdict. The record does not disclose how much longer, after dinner, that the jury deliberated. From the affidavit of one juror we learn that she was the tenth person to agree to the verdict and the inference is present that it required some persuasion for her to decide to vote for a guilty verdict. The length of the deliberation alone is evidence of doubt in the minds of the jurors. Therefore, it is impossible for us to know to what extent they could have been persuaded by the inward thought of further long deliberation when a verdict was thought to be required.

The information that a verdict was required was

wrong. But it was the kind of information that could readily influence impatient people, unduly anxious to return home or renew other duties.

Our statute, ORS 17.305, specifically enjoins the bailiff from making any communication with the jury, except to inquire if they have reached a verdict. The Supreme Court of Wisconsin has held in *State v. Cotter,* 1952, 262 Wis 168, 54 NW2d 43, 41 ALR 2d 222, a similar case to this one, that prejudice will be presumed and a new trial ordered when it appears that the bailiff has improperly communicated to the jury. The same rule has been followed in Georgia. *King v. The State,* 1955, 92 Ga App 616, 89 SE2d 585. Cases are cited by the state from other jurisdictions which hold that a new trial will not be granted unless prejudice is shown to the defendant. The state would have us hold that defendant must show prejudice. We think that is not the best rule and has not been followed by this court. As recently as October 26, 1960, in *Thomas v. Dad's Root Beer,* 225 Or 166, 356 P2d 418, this court, speaking by Justice HOWELL, said: "Under the circumstances, therefore, we cannot say that it is clear that the 'misconduct could not and did not influence the verdict.' [citing cases]"

■■ In a felony case, particularly where the penalty, as here, can be of long duration, the greatest of care should be exercised to obtain a fair trial. The rule should be inviolate that the jury can consider only such evidence and instructions that it receives in the courtroom. A court cannot attempt to speculate by some method of mind reading to know whether the bailiff's conduct actually influenced the mental process of any of the jurors. Admittedly, the statements made were improper. That some of the jurors thought it was said in a humorous vein was immaterial. The same

issue was made in the Wisconsin and Georgia cases. Humor can influence as readily as seriousness. When the members of the jury were in obvious doubt it is hard to say that the false belief that they had to reach a verdict did not influence one of the ten who voted for guilt. When we are in doubt the issue should be resolved in favor of the accused. The judgment must be reversed and a new trial ordered.

Other assignments made have been considered but are without merit and require no discussion.