(No. 36707.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* DANNY ESCOBEDO, Plaintiff in Error.

*Opinion filed May 27, 1963.*

42

[redacted]

BARRY L. KROLL, of Chicago, appointed by the court, (EUGENE J. FARRUG and DONALD M. HASKELL, of counsel,) for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH and E. MICHAEL O'BRIEN, Assistant Attorneys General, and RUDOLPH L. JANEGA and JAMES R. THOMPSON, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE HOUSE delivered the opinion of the court:

Danny Escobedo was indicted in the criminal court of Cook County for the murder of his brother-in-law, Manuel Valtierra. A jury found him guilty and fixed his sentence at 20 years confinement in the penitentiary. He seeks a review of the conviction on this writ of error.

The record shows that Manuel Valtierra was murdered in the backyard of his home on January 19, 1960. The evidence connecting defendant with the murder is his confession. It shows that decedent was married to defendant's

sister, that decedent and defendant had argued about decedent frequently beating the sister and that on January 19, 1960, defendant hired Benedict DiGerlando to murder his brother-in-law.

It is first argued that the trial court erred in admitting the confession into evidence. The defendant was immediately suspected of implication in the crime and was questioned on January 20 and at various other times, but there was not sufficient evidence to hold him. On January 30, 1960, DiGerlando was in custody and between 7:30 and 8:00 P.M. he made a statement to the police in which he named defendant as the one who fired the shots killing Valtierra. Defendant and his sister were arrested about 8:00 or 9:00 P.M. While they were on their way to the police station, Gerald Sullivan, one of the arresting officers, told defendant that DiGerlando had named him as the one who shot Valtierra. Defendant said he wanted to hear DiGerlando say that. Officer Montejano saw defendant about 10:00 and again repeated to him what DiGerlando said. Defendant said DiGerlando was lying. Montejano then asked defendant if he would like to hear DiGerlando say it and defendant said yes. After DiGerlando had accused defendant of shooting Valtierra at their confrontation, defendant told officers Montejano and O'Malley that DiGerlando was the one who fired the shots. Officer Flynn arrived about this time, 10:15 P.M., with officers Sullivan and McNulty, and officers Montejano and O'Malley left. Defendant told Flynn in the presence of Sullivan and McNulty that DiGerlando had done the shooting. About 11:30 assistant State's Attorney Theodore Cooper and court reporter Don Flannery arrived at the homicide bureau. Defendant then made the confession to Cooper. Cooper, Flannery and Montejano were present when the confession was made.

Warren Wolfson, defendant's attorney, arrived at the police station about 10:30 P.M. He asked several officers

for permission to see defendant. After his requests were denied he showed the officers the statutes concerning the right of an attorney to see his client. He left the station about 1:00 A.M. without having had a chance to consult with his client.

The defendant on direct examination testified that when he arrived at the police station he asked to see his lawyer. He said that Montejano approached him about 10:00 or 10:30 and told him that "DiGerlando had already made a statement saying that he shot the man, my brother-in-law, and he would see to it that we would go home and be held only as witnesses, if anything, if we had made a statement against DiGerlando." He said he gave no statement to Montejano after the promise was made and made no statement until the assistant State's Attorney arrived. Defendant's attorney then asked if the statement was true and defendant replied, "No it isn't." The attorney then asked, "Why did you make this statement to the State's Attorney?" The defendant answered, "I seen that my sister was being put at the head of this crime and I knew she had not done it and I wanted to help my sister and that is the reason why I made the statement." His attorney apparently was not content with this answer inasmuch as he asked the following questions:

"Q. Did the fact that you had been made promises by Montejano have any bearing upon your making this statement?

"A. Yes, it did.

"Q. Did the fact that the police officers had made promises specifically that you would not be prosecuted if you made this statement have any effect on your making that statement?

"A. Yes, it did.

"Q. Were these promises in fact the motivation that made you make this statement?

"A. Yes."

With a number of other leading questions the attorney also brought out that Montejano spoke to defendant in Spanish and told him that he had gone to school with his brother and could help him and that "Benny is Italian and there is no use in a Mexican going down for an Italian."

The defendant did not accuse any of the police officers with having beaten or threatened him. He said the promises made by Montejano were not made in the presence of any of the other officers and he did not tell the assistant State's Attorney of the alleged promises when he made the confession.

The police officers, assistant State's Attorney and the court reporter all testified that neither they nor anyone in their presence beat, threatened or made any promises to defendant. Officer Montejano denied that he made any promises to defendant or that he spoke to him in Spanish.

Under the circumstances disclosed by this record the trial court did not err in denying the motion to suppress the confession. The defendant was 22 years old. There is nothing to show he is of subnormal intelligence. On the contrary, the trial judge after hearing his testimony remarked, "I was impressed with this defendant's intelligence. I don't know how old he is, but he certainly is not ignorant by a long stretch of the imagination. He is pretty keen * * *." There is no suggestion of brutality or long and coercive questioning. While much is made of the circumstance that his request to consult with counsel was not immediately honored, the record shows that he had previously consulted with his attorney about the case and that he understood from a motion the lawyer made to him at the police station that he should not talk to the police. Although defendant testified that one officer made a promise to him, his testimony indicates that he did not rely on this alleged promise when making the statement. In any event, the officer denied making the promise and the trier of fact believed him. We find no reason for disturbing

the trial court's finding that the confession was voluntary.

Defendant argues then that the confession is inadmissible because it was obtained after he had requested the assistance of counsel, which request was denied. A minority of the Supreme Court in the cases of *Crooker* v. *California,* 357 U.S. 433, 441, 2 L. ed. 2d 1448, 1455, 78 S. Ct. 1287, 1292, (dissenting opinion); *Cicenia* v. *LaGay,* 357 U.S. 504, 511, 2 L. ed. 2d 1523, 1529, 78 S. Ct. 1297, 1301 (dissenting opinion); *Ashdown* v. *Utah,* 357 U.S. 426, 431, 2 L. ed. 2d 1443, 1447, 78 S. Ct. 1354, 1357 (dissenting opinion); *Spano* v. *New York,* 360 U.S. 315, 324, 3 L. ed. 2d 1265, 1272, 79 S. Ct. 1202, 1207 (concurring opinion), and *Culombe* v. *Connecticut,* 367 U.S. 568, 637, 6 L. ed. 2d 1037, 1077, 81 S. Ct. 1860, 1897, (concurring opinion), have expressed the view that denial of request for counsel by a suspect is denial of "the Assistance of Counsel for his defence" guaranteed by the sixth and fourteenth amendments and that a confession obtained after such denial cannot be used as evidence against him. This view was not adopted by a majority of that court in those cases, however, and specifically rejected in *Crooker* and *Cicenia.* The majority of the court held that "due process does not always require immediate honoring of a request to obtain one's own counsel in the hours after arrest" (*Crooker* v. *State of California,* 357 U.S. 433, 441, n. 6, 78 S. Ct. 1287, 1292, n. 6), but that the lack of counsel during the interrogation is "one pertinent element in determining from all the circumstances whether a conviction was attended by fundamental unfairness." (*Cicenia* v. *LaGay,* 357 U.S. 504, 509, 78 S. Ct. 1297, 1300.) Denial of request for counsel during interrogation by the police, in and of itself, has not therefore been recognized as a denial of due process under the fourteenth amendment requiring exclusion of defendant's confession.

Defendant, nevertheless, urges this court to announce a rule which would prevent the use of a confession where

there has been a denial of a request for assistance of counsel during the interrogation which produced the confession. This court has recognized that a voluntary confession is often the highest type of evidence of the confessor's guilt and that such evidence should not be excluded except for some overriding public interest. (*People* v. *Hall,* 413 Ill. 615.) Mr. Justice Traynor of the California Supreme Court has stated it this way: "The perpetrator of a crime is normally the one who knows most about it, and his confession, voluntarily made is often the best evidence of his guilt that can be obtained. [Citations.] Only overwhelming social policies can justify the exclusion of such vital evidence. In the case of coerced confessions, the evidence may be unreliable; even if reliable, a free society cannot condone police methods that outrage the rights and dignity of a person whether they include physical brutality or psychological coercion. [Citations.] When a confession is voluntary, however, courts are reluctant to exclude it." (*People* v. *Garner,* 57 Cal. 2d 135, 162-63, (concurring opinion).) Indeed, this court has recognized its duty to permit the use of such evidence where it has been voluntarily given. *People* v. *Hall,* 413 Ill. 615.

Having briefly examined the basic principles underlying the admission or exclusion of a confession, we turn to the interrelationship between confessions and interrogation. Professor Inbau has pointed out, "human beings ordinarily do not utter unsolicited, spontaneous confessions. They must first be questioned regarding the offense. * * * [I]t is impractical to expect any but a very few confessions to result from a guilty conscience unprovoked by an interrogation." (Inbau, Restrictions in the Law of Interrogation and Confessions, 52 Nw. U. L. Rev. 77, 82.) "The police may be midwife to a declaration naturally born of remorse, or relief, or desperation, or calculation." *Culombe,* v. *Connecticut,* 367 U.S. 568, 576, 81 S. Ct. 1860, 1864.

The right of the police to interrogate suspects has

never been seriously questioned. Indeed such right is recognized in the many decisions of this court holding that a confession need not proceed wholly at the suggestion of the accused in order to be voluntary but that it may be elicited by questions asked by the police. (*People* v. *Miller*, 13 Ill.2d 84; *People* v. *Goard*, 11 Ill.2d 495; *People* v. *Davis*, 10 Ill.2d 430; *People* v. *Lazenby*, 403 Ill. 95.) "Despite modern advances in the technology of crime detection, offenses frequently occur about which things cannot be made to speak. And where there cannot be found innocent human witnesses to such offenses, nothing remains —if police investigation is not to be balked before it has fairly begun—but to seek out possibly guilty witnesses and ask them questions, witnesses, that is, who are suspected of knowing something about the offense precisely because they are suspected of implication in it." (*Culombe* v. *Connecticut*, 367 U.S. 568, 571, 81 S. Ct. 1860, 1861.) In short, "Questioning suspects is indispensable in law enforcement," (*People* v. *Hall*, 413 Ill. 615, 624, quoted in *Culombe* v. *Connecticut*, 367 U.S. 568, 578, 81 S. Ct. 1860, 1865,) and the police have not only the right but the duty to question suspects. (See *State* v. *Smith*, 32 N.J. 501, 161 A. 2d 520.) A valid basis for allowing confessions solicited by fair and reasonable questioning is that such questioning may open the door to the natural psychological compulsion to confess, which has been recognized and described. (See Wigmore on Evidence, 3rd ed. § 851.) "So long as the methods used comply with due process standards, it is in the public interest for the police to encourage confessions and admissions during interrogation." *People* v. *Garner*, 57 Cal. 2d 135, (concurring opinion); see also Wigmore, 3rd ed. § 851.

This brings us to the question of whether a suspect has the right to assistance of counsel during the interrogation. Allowing counsel to be present during interrogation of a suspect would, of course, afford him some protection

against possible mistreatment by the police (*Crooker* v. *State of California,* 357 U.S. 433, 441, 78 S. Ct. 1287, 1293 (dissenting opinion) and provide him with legal advice. (*Culombe* v. *Connecticut,* 367 U.S. 568, 637, 81 S. Ct. 1860, 1897 (dissenting opinion).) The attorney's role during police interrogation would not, however, be limited to preventing police mistreatment or advising him of his right against self-incrimination. Mr. Justice Jackson laid bare the problem with these remarks: "To bring in a lawyer means a real peril to solution of the crime because, under our adversary system, he deems that his sole duty is to protect his client—guilty or innocent—and that in such a capacity he owes no duty whatever to help society solve its crime problem. Under this conception of criminal procedure, any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to the police under any circumstances." (*Watts* v. *Indiana,* 338 U.S. 49, 59, 93 L. ed. 1801, 1808, 69 S. Ct. 1347, 1358 (concurring opinion).) This sentiment was recognized in *Crooker* v. *California* ("it would effectively preclude police questioning—*fair as well as unfair,*" 357 U.S. 433, 441, 78 S. Ct. 1287, 1292,) and in *Cicenia* v. *LaGay* (it "would constrict state police activities in a manner that in many instances might impair their ability to solve difficult cases." 357 U.S. 504, 509, 78 S. Ct. 1297, 1300).

Common sense dictates that the presence of an accused's attorney would preclude effective police interrogation even though the questioning be fair. The law, of course, protects an accused whose will to confess has been overborne by excluding the use of the confession as evidence against him. It does not follow, however, that he is entitled to have someone present, who under the auspicies of giving legal advice, warns and advises him against reacting to his first natural sensations to confess. As long as the questioning is fair, incriminating statements of an accused are not likely to result from any idea that he must

answer, that is as a result of his ignorance of his right against self-incrimination, but are likely to result from his free choice to make them. In any event, it is possible for someone other than his attorney to advise him of his right against self-incrimination and let the accused invoke the right rather than his attorney. The exclusion of a voluntary confession made outside the presence of counsel or the preclusion of effective interrogation by the presence of counsel is a high price to pay for whatever deterrent effect the presence of counsel would have on police abuses. If the police abuse their right to interrogate, the confession will be excluded.

This case bears out the above observations. The defendant was immediately suspected of implication in the crime. The murder occurred about midnight and the police had located him and taken him into custody within two and a half hours. He was held ·from 2:30 A.M. until 5:00 P.M. that evening when his attorney secured his release on a writ of *habeas corpus*. He was questioned during a part of this 17-hour period, but he did not confess. There is no suggestion of any beating, threats or promises by the police during this period. The record also shows that defendant was questioned by the police after his release on January 20 and before he was again taken into custody on January 30. This questioning did not result in a confession. This would indicate that ignorance of his right against self-incrimination, if it existed, did not cause him to confess during interrogation while in custody on January 20 or interrogation while not in custody between January 20 and January 30.

DiGerlando was in custody on January 30 and between 7:30 and 8:00 P.M. told the police that defendant had fired the shots that killed decedent. The police then took defendant into custody and told him what DiGerlando had said. Defendant testified that he asked for his lawyer. His lawyer arrived shortly after he was taken into custody

and demanded to see his client. Lieutenant Flynn told the lawyer that they had just had defendant in custody a short time, that they were questioning him and that he could see defendant as soon as they were done.

While it is argued that the attorney was there to consult with the defendant, the record shows that the attorney and defendant had talked about the case a few days before. The lawyer had 10 days before the arrest on January 30 to consult with defendant and was advised that he could again consult with him after the police had had a reasonable opportunity to interrogate him.

The nature of the advice the attorney was going to give the defendant also appears from the record. While the lawyer was talking to Lieutenant Flynn, defendant was sitting where he could see the lawyer and the lawyer could see him. The lawyer apparently yelled to defendant not to talk to the police, although defendant testified that he did not understand what he yelled. Defendant did testify, however, that the attorney motioned to him with his head which he understood to mean that he should not talk to the police.

It seems apparent that the confrontation with Di-Gerlando precipitated the confession. As Professor Wigmore has pointed out, "every guilty person is almost always ready and desirous to confess, as soon as he is detected and arrested." (Wigmore on Evidence, 3rd ed. § 851.) All the questioning prior to January 30 did not affect defendant, but as soon as he was confronted by Di-Gerlando he confessed. If the lawyer had been present to give the advice he was trying to give, defendant might have reacted from his first sensations, yielded to his lawyer's solicitations, and come "under the sway of the natural human instinct to struggle to save himself by the aid of all technicalities." Wigmore on Evidence, 3rd ed. § 851.

Defendant, of course, had the right to consult with counsel at the pretrial stages of the criminal proceeding.

Our legislature has provided that "all public officers * * * having the custody of any person * * * for any alleged cause whatever, shall, except in cases of imminent danger of escape, admit any practicing attorney at law of this state, whom such person so restrained of his liberty may desire to see or consult, to see and consult such person so imprisoned, alone and in private, at the jail or other place of custody; * * *." (Ill. Rev. Stat. 1961, chap. 38, par. 736c.) The legislature has also made it a misdemeanor for anyone, while holding another person in custody, to deny that other person his right to consult and be advised by an attorney at law. (Ill. Rev. Stat. 1961, chap. 38, par. 736b.) These statutes show a legislative policy against the police or other public officers insulating a person from his attorney, but it does not follow that the legislature intended that the statutes operate to insulate the person from the police or other public officials.

We have, of course, examined and considered the views of many courts and commentators to which we have not specifically referred in considering this problem. (See *e.g. People* v. *Garner,* 57 Cal. 2d 135, 367 P. 2d 680; *People* v. *Di Basi,* 7 N.Y.2d 544, 166 N.E.2d 825; *People* v. *Waterman,* 9 N.Y.2d 561, 175 N.E.2d 445; *State of Oregon* v. *Kristich,* 226 Ore. 240, 359 P.2d 1106; Kamisar, "The Right to Counsel and the Fourteenth Amendment," 30 U. of Chi. L. R. 1; Rothblatt & Rothblatt, "Police Interrogation: The Right to Counsel and to Prompt Arraignment," 27 Brooklyn L. Rev. 24; Boyle, "Permissible Police Practice: Recent Developments," 46 Marquette L. Rev. 227.) Having given due weight to the various considerations involved, we are of the opinion that the right of a person in custody to see and consult with his attorney does not deprive the police of their right to a reasonable opportunity to interrogate outside the presence of counsel.

Defendant then argues that he was not proved guilty beyond a reasonable doubt. This argument is based on

some discrepancies as to the time and presence of various persons during the questioning. The confession was properly admitted in evidence and the jury believed it. There was evidence sufficient to prove his guilt beyond a reasonable doubt.

It is finally argued that the prosecutor made prejudicial remarks during his closing argument. We have examined these remarks and find that they are not of such a nature as would justify a reversal of this conviction.

The judgment of the criminal court of Cook County is affirmed.

*Judgment affirmed.*