Argued January 8, reversed May 29, 1963

# CARSON *v.* BRAUER
382 P. 2d 79

*Richard Bryson,* Eugene, argued the cause for appellant. On the brief were Calkins and Bryson, Eugene.

*Arthur C. Johnson,* Eugene, argued the cause for respondent. On the brief were Johnson, Johnson & Harrang, Eugene.

Before McAllister, Chief Justice, and Rossman, Perry, Sloan, O'Connell, Goodwin and Denecke, Justices.

ROSSMAN, J.

This is an appeal by the defendant, Dr. Albert J. Brauer, from an order which the circuit court made upon the plaintiff's motion. The order set aside a judgment entered in the defendant's favor after trial by jury and granted a new trial of the action. This is

also a cross appeal by the plaintiff from the judgment thus set aside. The action, out of which the challenged judgment arose, was based upon charges of negligence which the plaintiff made against the defendant who became his physician when one of his legs was fractured and placed a plaster of Paris cast upon it. The complaint alleges that the defendant placed the cast negligently, that gangrene developed, and amputation became necessary.

The sole assignment of error which the appellant (physician) presents reads: "The trial court erred in granting a new trial." Those words are succeeded by the following:

"The bailiff's remarks were not a violation of ORS 17.305."

"If ORS 17.305 was violated, prejudice must still be shown."

"The bailiff's remarks to a juror in this case were not prejudicial."

The words "The bailiff's remarks" refer to a brief conversation between the bailiff and one of the jurors which occurred after the case had been submitted to the jury and while the latter were in a restaurant for dinner.

ORS 17.305 reads:

"After hearing the charge, the jury may either decide in the jury box or retire for deliberation. If they retire, they must be kept together in a room provided for them, or some other convenient place, under the charge of one or more officers, until they agree upon their verdict or are discharged by the court. The officer shall, to the utmost of his ability, keep the jury together, separate from other persons, without drink, except water, and without food, except ordered by the court. He

must not suffer any communication to be made to them, nor make any himself, unless by the order of the court, except to ask them if they have agreed upon their verdict, and he shall not, before the verdict is rendered, communicate to any person the state of their deliberations or the verdict agreed on. Before any officer takes charge of a jury, this section shall be read to him, and he shall be then sworn to conduct himself according to its provisions to the utmost of his ability."

The plaintiff-respondent presents the following four assignments of error:

"The court below erred in failing to grant a new trial upon the ground of jury misconduct. The plaintiff made the following motion: * * *"

"The Court erred in denying plaintiff's motion for a new trial upon the ground of jury misconduct based upon a juror's failure to disclose bias and information known to the juror, resulting in prejudice to the plaintiff."

"Taking all of the acts of misconduct committed by the jury and the misconduct of the bailiff together, plaintiff did not receive a fair trial."

"The court erred in striking from plaintiff's complaint and removing from the consideration of the jury the Fifth Specification of Negligence, which reads: * * *"

After the verdict had been returned and judgment upon it had been entered, the plaintiff filed his motion for a new trial and accompanied it with twelve affidavits. Six of the affidavits were by five jurors, three were by counsel for the plaintiff, two were by courtroom spectators, and one was by the bailiff. All described incidents which the plaintiff claimed subjected the jury to wrongful influences. The affidavits charged individual wrong-doings to the bailiff, two jurors, and a member of the audience. No one claims

corruption, dishonesty, or evil purpose on anyone's part.

The affidavit of the bailiff stated:

"* * * During the evening of December 8, 1961, after the Jury had retired and commenced its deliberations, it was necessary to take the Jury to dinner. During the dinner hour at the Del Ray Restaurant, one of the Jurors asked me, 'How long do we have to stay?' I answered, 'Until you reach a verdict.' The Juror then asked, 'How long have some juries been out?' I answered, 'One was out until 3:30 in the morning.' The Juror then asked 'Will the Judge send us some place to sleep?' I answered, 'That is up to the Judge.' It is difficult to recall the precise words, but the foregoing is as accurate as I can recall. After those remarks were made, I suggested that it was best that we change the subject and that was done."

The affidavits by jurors, which the plaintiff filed, with the exception of the 5th, pertained to incidents which occurred in the jury room. In these affidavits one or more jurors deposed: (1) a juror mentioned an experience that she had had with a plaster of Paris cast, (2) another juror, based upon personal experience, expressed an unfavorable opinion of the skill and veracity of two physicians who testified for the plaintiff, (3) still another juror mentioned that a curtain attached to hospital beds in wards prevents the occupant of one bed from seeing into another, (4) a juror who changed her vote from the plaintiff to the defendant stated that her husband was waiting for her in the court house, (5) still another juror who had voted up to the last ballot for the plaintiff stated on the way home to a juror who voted constantly for the plaintiff that she couldn't "stay all night. I had to go to work the next day." The affidavits of two spec-

tators deposed that the defendant's father-in-law, a clergyman who attended the trial, assumed at times a posture of prayer.

The above brief sketch of the plaintiff's affidavits affords an impression of their contents.

The defendant-appellant presented ten affidavits—nine from jurors. The foreman of the jury deposed:

"There was some discussion during dinner as to how long we would be out, but to my knowledge there was no one that showed any attitude during deliberations that he or she was making a vote because he or she was anxious to finish deliberations."

The foreman's and other affidavits stated that when any juror mentioned a personal experience he was at once reminded of the instructions which told the jury that personal experiences must be ignored. Some of the juror affidavits contradicted or modified those that the plaintiff had filed. No affidavit from any juror which either the plaintiff or the defendant filed mentioned the bailiff's affidavit. The individual to whom the bailiff spoke was left undisclosed. No one said that he heard the bailiff speak.

We will now consider specifically the bailiff's affidavit. It states that while the jury was in a restaurant for dinner, "one of the Jurors asked me * * *. The Juror then asked * * *. The Juror then asked * * *." The bailiff's use of the terms "one of the Jurors" and "The Juror" possibly indicates that the conversation was between the bailiff and one juror only. The identity of the juror who spoke to the bailiff, as we have seen, was not disclosed. Nothing reveals, at least not directly, whether or not the juror to whom the bailiff spoke, whoever he may have been, was desirous of

going home shortly or made the inquiry for nothing but conversational purposes. Only the bailiff's affidavit mentions the conversation. Although the affidavit of the foreman deposes that during the dinner "there was discussion \* \* \* as to how long we would be out," it does not mention the bailiff nor the latter's conversation with a juror. The affidavit pertaining to one of the jurors who was required to be at her place of employment the following morning does not indicate that she was familiar with the bailiff's words or surrendered her views in order to hasten home. Another juror mentioned in the jury room that her husband awaited her in the court house, but there is no indication that that juror was familiar with what the bailiff had said or was anxious to proceed home. The foregoing is the extent to which the affidavits indicate that any juror felt that time was a factor.

■■ Although ORS 17.305, supra, is intended to promote the purity of the verdict, we do not believe that it should be construed literally and yield a reversal whenever the limits of literal compliance are exceeded. A juror might ask a bailiff whether he could use the telephone; or in the late evening the hour at which the bus lines cease operation for the night. Likewise, in the event it was announced that the jurors would be taken to a hotel for the night, some jurors might seek the name of the hotel or ask whether they will be provided with night clothes. Yet, if the bailiff's words are limited to literal compliance with ORS 17.305, he could respond to such inquiries only by asking whether the jury "had agreed upon a verdict." If a court granted a new trial in instances of the kind just conceived, it would not promote justice. Plainly, ORS 17.305 prohibits the bailiff from saying anything

whatever to the jury except to make such communications as are necessary in the discharge of his duties as the officer in charge of the jury. The statute, however, does not require a reversal on account of communications by the bailiff incidental to his custodial duties which could not have had any influence upon the deliberations of the jury.

If it should be assumed that a statement by a bailiff in reply to a juror's question that the jury is expected to reach a verdict can be deemed a communication unauthorized by ORS 17.305, we are aware of nothing that establishes that the bailiff's statements were prejudicial. Previous paragraphs show that no affidavit except the bailiff's mentions the bailiff's communication.

■ The trial judge did not decide that the bailiff's words influenced the jurors for or against either party. He ruled that because the bailiff uttered the words that are reported in her affidavit, he was required to vacate the judgment and order a new trial. He based his decision upon *State v. Kristich,* 226 Or 240, 359 P2d 1106, and in so ruling stated:

> "* * * once having concluded that the foregoing communications occurred, the Kristich case then gives me no further discretion. I note further only that I consider the last answer to the question (as shown by bailiff's affidavit) as proper. I do not decide as to whether or not, in my opinion, the jurors were influenced by these two questions and answers or that they are in any way prejudicial to plaintiff's case."

The Kristich decision states:

> "* * * The state would have us hold that defendant must show prejudice. We think that is not the best rule and has not been followed by

this court. As recently as October 26, 1960, in Thomas v. Dad's Root Beer, 225 Or 166, 356 P2d 418, this court, speaking by Justice Howell, said: 'Under the circumstances, therefore, we cannot say that it is clear that the "misconduct could not and did not influence the verdict." ' "

A substantial distinction exists between the facts of this case and those of *State v. Kristich,* supra. In the Kristich case the defendant was charged with a felony. Charges that can consign a party to a penitentiary cause the courts to view each development in the case with a more critical attitude and with a greater demand for faithful compliance with procedure's rules than when the case prays for nothing more than a judgment for money. In the Kristich case a juror asked the bailiff if it were necessary for the jury to reach a verdict. According to the decision, "the bailiff * * * replied that it was; that the defendant had been tried once before and therefore it was necessary to arrive at a verdict." Thus was emphasized at the hour of deliberation the fact that this was the defendant's second trial. Continuing, the decision said, "Most of the jurors heard the statements made." By reverting to the review of the facts set forth in previous paragraphs of this opinion, it will be noticed that what occurred in this case was materially different from the developments in the Kristich case. Still another distinction must be mentioned. The new trial in the Kristich case was not granted by the circuit court in ruling upon the defendant's motion for a new trial. The circuit court denied that motion. It was this court which granted the new trial. This court did so after reading the affidavits concerning the bailiff's conduct. Motions for new trial are governed by ORS 17.610 and that section is rendered applicable

to criminal cases, such as the Kristich case, by ORS 136.850. The circuit court, as shown by decisions of this court, many in number, is invested with discretion in ruling upon motions for new trial. The Kristich case is modified to the extent that we believe that case should have been remanded to the trial court with instructions for it to determine what, if any, misconduct had occurred and whether such misconduct "materially affected the substantial rights" of the defendant. ORS 17.610.

In the case now at bar the circuit court did not determine whether the bailiff's remarks had prejudicial effect upon the jurors. The circuit court felt itself bound by the Kristich decision. Unless the remarks actually prejudiced the plaintiff's case, the judgment should not have been vacated and a new trial should not have been ordered. The cause is therefore remanded to the circuit court so that it may make the necessary determination and rulings.

We have mentioned the affidavits of the jurors. The plaintiff filed his to support his motions for a new trial. The circuit court found no basis in those affidavits for the grant of a new trial. The order for the new trial was entered solely on the basis of the bailiff's affidavit.

One function that a verdict and its resulting judgment should perform is to terminate, if possible, the controversy out of which the judgment arose. One of society's major purposes in creating the state and establishing courts is to terminate controversy. If a verdict is to terminate controversy and if the resulting judgment is to possess value for the successful party, the judgment must have the attributes of finality, stability and permanency. Its overthrow must not be easy of accomplishment. Complete honesty,

probity and uprightness must at all times be exacted of the jurors, but the courts must recognize that when the jurors, as laymen, are by themselves in the jury room they may at times indulge in remarks of doubtful merit. The state must assume that the tongue's slip up in instances of that kind does not tilt the scales.

In *Jorgensen v. York Ice Machinery Corp.*, 160 F2d 432, Judge Learned Hand said, concerning a motion for a new trial which charged misconduct of the jury:

"* * * On the other hand, it would be impracticable to impose the counsel of absolute perfection that no verdict shall stand, unless every juror has been entirely without bias, and has based his vote only upon evidence he has heard in court. It is doubtful whether more than one in a hundred verdicts would stand such a test; and although absolute justice may require as much, the impossibility of achieving it has induced judges to take a middle course, for they have recognized that the institution could not otherwise survive; they would become Penelopes, forever engaged in unravelling the webs they wove. Like much else in human affairs, its defects are so deeply enmeshed in the system that wholly to disentangle them would quite kill it. * * *"

■ From the very beginning this court, in an effort to give verdicts and judgments permanency, has refused to permit the jurors who served in the case to impeach their verdict. In *Cline v. Broy*, 1 Or 89, Chief Justice WILLIAMS, in rejecting a juror's affidavit, said: "Affidavits of jurors will not be received to impeach their verdict."

In *State v. Smith*, 43 Or 109, 71 P 973, the defendant, after sentence to execution for homicide, based a motion for a new trial in part upon the affidavit of

a juror who swore that he joined in the conclusion reached by the others "under the apprehension that if they were not discharged without delay the effect of the confinement upon Ball (a juror whose ebbing strength had required repeated attention from a physician during the trial) would be serious." The denial of the motion for a new trial was sustained by this court on rule that a juror's affidavit is not admissible to impeach his verdict.

*State v. Imlah,* 204 Or 43, 281 P2d 973, analyzes the rule that lends stability to verdicts and reviews our holdings which rejected attacks upon them undertaken through the use of juror affidavits. The defendant in that case was under sentence to execution for first degree murder. His attack upon his verdict failed. The decision said in part:

> "We do not deem it necessary to decide now whether under any circumstances a departure from the rule so firmly established in this state might be sanctioned. Assuming that in a case of the utmost gravity and importance it should become manifest that enforcement of the rule would violate 'the plainest principles of justice (McDonald v. Pless, supra) and that to prevent such a consequence the court would feel impelled to receive testimony of jurors impeaching their verdict, this is certainly not a case for the introduction of any such exception.' "

*State v. Gardner,* 230 Or 569, 371 P2d 558, reviewed and classified all of the Oregon cases that sought the impeachment of verdicts through juror affidavits. The attack upon the verdict in that case failed. The decision left for future determination the limits to be imposed upon such affidavits. The only limitation definitely set by the Gardner case is the following:

> " 'Upon an inquiry as to the validity of a ver-

dict or an indictment no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him to assent to or dissent from the verdict or indictment or concerning the mental processes by which it was determined.' Handbook of the National Conference of Commissioners on Uniform State Laws, p. 188 (1953)."

■ To the above stated rule we add a further one that affidavits showing oral communications between jurors are insufficient to impeach a verdict. Subsequent cases before this court reveal, however, some uncertainty on the part of the bar. While jurors' affidavits are receivable in evidence in the sense that the trial court should permit them to be filed, affidavits which disclose nothing more than oral misconduct during the jury's deliberations cannot impeach a verdict. In order to make plain the meaning of the rule, we will restate it: The affidavit of a juror concerning utterances of other jurors during the deliberations or at any other material time cannot warrant the impeachment of a verdict. The kind of misconduct of a juror that will be considered in an attack upon a verdict by a juror's affidavit within the rule set forth in the Gardner and Imlah cases is misconduct that amounts to fraud, bribery, forcible coercion or any other obstruction of justice that would subject the offender to a criminal prosecution therefor. We do not necessarily use the words "fraud," "bribery," "forcible coercion," and "obstruction of justice" in a purely technical sense, but as words that denote such serious breach of the juror's duties that the trial judge would be justified in citing him for nothing less than a contempt of court. *Clark v. United States,* 289 US 1, 77 L Ed 993, 53 S Ct 465, is an illustration. When this court said in the Gardner case that affi-

davits by jurors may impeach verdicts where there was misconduct of such a serious nature as to have deprived a party of a "fair trial," the words "fair trial" may perhaps mislead some one. The quoted term takes the emphasis away from the word "serious." Many litigants are inclined to suspect, immediately after losing a case, that a fair trial was not had. There is a great temptation to prepare affidavits for the signatures of such jurors as can be prevailed upon to give them. The overriding policy of the law in this respect is to favor the finality of the verdict as *State v. Gardner* points out. Obviously, this policy would be frustrated if affidavits concerning conversations in the jury room are to be examined to see whether or not a trial was fair. Conversations in the jury room, under the Uniform Rules of Evidence, which we have previously approved, are irrelevant. The abstract fairness of such conversations is equally irrelevant. Except for the kind of criminal misconduct which we described, the risk of extraneous and improper conversation that may or may not find its way into a jury's deliberation is simply a risk that litigants assume when they submit their disputes for determination by the jury system. The many Oregon authorities in support of this proposition are fully set forth in the Gardner case and need not be cited again here. To the extent that the "fair trial" language in the Gardner case may have been understood as a departure from the rule that oral misconduct is not a ground for impeachment, the case must be considered as modified by the statement herein made.

■ The juror affidavits cannot support the attack which the plaintiff makes upon the verdict.

The plaintiff contends that a juror by the name of Mrs. Winkley failed to reveal, upon voir dire ex-

amination, a distrust that it is said she had of the physicians who later testified for the plaintiff. The voir dire examination was not reported by a court reporter. For its nature we are dependent upon affidavits that are contradictory. The trial judge, in a memorandum opinion, gave careful attention to this phase of the plaintiff's charges and in finding no merit in it stated:

> "I am not prepared to say that Juror Winkley failed to make disclosure or otherwise misconduct herself to the prejudice of plaintiff."

We adopt that view as our own.

The above disposes of all issues presented by the appellant (defendant) and by the cross-appellant (plaintiff) with the exception of the cross-appellant's fourth assignment of error. We think that every issue embraced within the averment of the complaint that is mentioned in that assignment of error was fully litigated and that, therefore, the fourth assignment of error reveals no prejudice to which the plaintiff was subjected.

The affidavits filed by the plaintiff do not indicate that anything occurred in the jury room which was of the general type of misconduct that we have denoted by the words "fraud," "bribery," "forcible coercion," or "other obstruction of justice." The record indicates that the jurors endeavored in good faith to analyze the evidence thoroughly and reach an honest verdict. It is true that two of them mentioned experiences that they had undergone which were somewhat similar to the case under consideration; but when jurors are together for more than seven hours and are earnestly discussing the evidence, the discussion may call to mind a by-gone experience and induce mention of it.

Mere mention of it is not misconduct of the kind that we denoted in preceding paragraphs.

The plaintiff's cross-appeal and the assignments of error that are based upon it reveal no merit. The order challenged by this appeal is reversed. The appellant's assignment of error reveals merit. The cause is remanded to the circuit court so that it may once more pass upon the motion for a new trial, but in accord with the above rulings.

Reversed.

McALLISTER, Chief Justice, and PERRY and GOODWIN, Justices, concur in this opinion.

DENECKE, J., specially concurring.

I concur in the majority opinion that the conduct of the jurors, as disclosed by the affidavits, is not a ground for setting aside the verdict. However, I believe it is unrealistic and unnecessary to write, "Affidavits of jurors will not be received to impeach their verdict," or that such affidavits are not to be examined or are irrelevant. In my opinion such statements hide the real process that occurs. The trial judge attempts to find out whether there was misconduct on the jury's part.[1] If, judged by the precedents of this court, the misconduct "would violate 'the plainest principles of justice'" the trial court will set

---

[1] It is my opinion that if the trial court believes, on the basis of the affidavits, that there may have been serious misconduct, it holds a hearing on the matter with witnesses sworn and cross-examination permitted. In light of ORS 17.615-17.625 and State v. Magers, 36 Or 38, 58 P 892, the correctness of this procedure is not free from doubt, but normally it is the only method by which the trial court can determine the facts. Affidavits are admissible evidence in only a few instances. ORS 45.120. They are admissible to support a motion for a new trial on the ground of misconduct. They are the weakest kind of evidence. 32 CJS 1075, Evidence § 1032, n 81.

aside the verdict. (*State v. Imlah,* 204 Or 43, 55, 281 P2d 973, which in turn quoted from *McDonald v. Pless,* 238 US 264, 59 L ed 1300, 35 S Ct 783.) It is the seriousness of the misconduct which is the crux of the problem and all these other statements obscure this. *State v. Gardner,* 230 Or 569, 371 P2d 558, merely attempts to lift the veils and reveal the true issue. I do not interpret *State v. Gardner,* supra, as any attempt to relax the well-established principle of this and most courts that only the most gross jury misconduct will afford grounds for setting aside a verdict.

I also cannot concur with the majority's attempt to set out "guidelines"[®] outlining what misconduct is so serious as to justify setting aside a verdict. Such disagreement is not intended to indicate that any lesser misconduct should be grounds to set aside a verdict. The disagreement is because the "guidelines" are abstract without relation to the facts of this case and because I doubt that they will cover the myriad combinations of facts which will come before this court.

SLOAN and O'CONNELL, JJ., concur.

[®] From Mr. Justice Harlan's dissent in Sanders v. United States, No. 202, US S Ct, April 29, 1963.