Argued and submitted March 15, in case no. A47400, order granting new trial vacated; reversed and remanded for re-entry of judgment entered February 25, 1988; in case no. A46970, judgment affirmed July 12, reconsideration denied August 25, petition for review allowed November 14, 1989 (308 Or 500)

ERTSGAARD et al,
*Respondents,*

*v.*

BEARD,
*Defendant,*

*and*

ALLEN,
*Appellant.*

(86-C-10722; CA A46970 (Control))

ERTSGAARD,
*Respondent,*

*v.*

BEARD,
*Defendant,*

*and*

ALLEN,
*Appellant.*

(86-C-10721; A47400)
(Cases Consolidated)

777 P2d 971

Kim Jefferies, Portland, argued the cause for appellant. With her on the brief was Wood, Tatum, Mosser, Brooke & Landis, Portland.

J. Michael Alexander, Salem, argued the cause for respondents. With him on the brief was Burt, Swanson, Lathen, Alexander & McCann, Salem.

Before Graber, Presiding Judge, and Riggs and Edmonds, Judges.

GRABER, P. J.

Riggs, J., concurring in part; dissenting in part.

## GRABER, P. J.

Defendant Allen appeals from two judgments and one order granting a new trial in these medical malpractice actions. The issues are whether the trial court abused its discretion in granting a new trial and whether it erred in allocating a pretrial settlement. We vacate the order granting a new trial and affirm the allocation.

Angela Ertsgaard was a patient of Dr. Allen and Dr. Beard during her pregnancy in 1983 and 1984. She developed preeclampsia and, later, eclampsia, as a result of which she suffered seizures and other problems. Her baby, Sean Ertsgaard, was delivered at 28 weeks, 12 weeks prematurely.[1]

Angela and her husband, Reid, filed an action for personal injury and loss of consortium against Beard and Allen. Sean filed a separate action against them. The cases were consolidated. Before trial, Beard settled with all three plaintiffs for a total of $300,000. By agreement of all parties, the $300,000 would not be allocated until after the trial against Allen. The trial resulted in verdicts for Allen on Reid's and Sean's claims and a verdict for Angela of $226,000.

Sean then moved for a new trial on the ground of juror misconduct. ORCP 64B(2); *see Carson v. Brauer,* 234 Or 333, 382 P2d 79 (1963). One juror allegedly had failed to disclose on *voir dire* that her niece[2] had been treated successfully by Allen for cancer and that the juror therefore was biased in favor of Allen. The juror allegedly demonstrated that bias in the jury's deliberations. Her actions were revealed when two other jurors contacted Sean's attorneys after trial and informed them of the challenged juror's statements during deliberations. The trial judge granted Sean's motion for a new trial, and Allen assigns error to that ruling.

Allen argues that the trial court erred in considering

---

[1] There is conflicting medical evidence about the relationship between defendants' treatment of Angela's condition and Sean's premature birth. That relationship does not bear on the issues raised here.

[2] The record is not clear as to whether it was the juror's niece or daughter who had seen Allen, but most references are to a niece.

the jurors' affidavits[3] and that, in any event, the affidavits did not support impeachment of the verdict. Sean concedes that the only proper basis for affirmance is "bias [that] was improperly concealed during *voir dire*," rather than alleged misconduct during the jury's deliberations. *See State v. Gardner,* 230 Or 569, 575, 371 P2d 558 (1962). He relies primarily on *State v. Salas,* 68 Or App 68, 680 P2d 706, *rev den* 297 Or 601 (1984), to support his claim of improper concealment. *See also State v. Lauth,* 46 Or 342, 80 P 660 (1905). In *Salas,* we said:

> "On *voir dire* the challenged juror was asked, 'Is there anything about you that we should know that would make it difficult for you to be a fair juror to both sides?' The juror answered, 'No.' She also was asked, 'Will you follow the judge's instructions as to the law?' She answered, 'Yes.' She also was asked, 'Can you think of any reason why you cannot be fair to Mr. Salas and the state of Oregon?' She answered, 'No.' " 68 Or App at 71 n 2.

Another juror reported after trial that the challenged juror had related in the course of deliberations that she knew the defendant and his family, that he "had been in trouble with firearms before," and that "he could not be believed." 68 Or App at 70. We observed that the integrity of the jury system and the right to a fair trial require that a defendant "be tried by a jury that does not include anyone who, at the outset, harbors serious doubts about his credibility on the basis of undisclosed out-of-court familiarity with him." 68 Or App at 70. (Footnote omitted.) Accordingly, we held that the defendant was entitled to a new trial.

Here, the questions and answers that gave rise to the alleged juror misconduct were as follows:

"Q [BY PLAINTIFF'S ATTORNEY]: * * * Do you know anybody that's connected with [this case]?

"A When my regular family physician retired some years

---

[3] We reject Allen's assertion that Sean's counsel acted improperly, because it appears that counsel did not solicit the post-trial juror contact and did bring the alleged irregularity promptly to the court's attention. *See D. C. Thompson and Co. v. Hauge,* 300 Or 651, 717 P2d 1169 (1986); *Niemela v. Collings,* 267 Or 369, 516 P2d 268 (1973). In the light of our disposition of the case, we need not decide whether the court erred in declining to bring the jurors back for questioning in person; we assume in our analysis that the statements in the affidavits are true.

ago Dr. Allen took over his practice, and I saw her as a patient a couple of times before I switched over to Kaiser.

"Q   All right. Anything about that that would embarrass you or bother you in a case of this kind?

"A   No.

"Q   The questions here are going to be basically addressed as to whether or not Dr. Allen made a mistake, and if she did, what the results of that were. We both want 12 people who will look at it, make a decision based on the evidence, and then have the jury say what they think. Do you fit that pattern?

"A   Yes, I do.

"Q   All right. Now, we've talked about emotion. I think maybe we're not in complete agreement on that. I think you may be told that emotion is fine, but you're not to base a verdict on it. No one expects the jury to be a bunch of robots, but you're not to base a verdict on your emotions but only on the facts. Could you follow that?

"A   Yes, I could.

"* * * * *

"Q   Anything you think I should know or [Allen's attorney] should know before we pass on you as a juror?

"A   I don't think so.

"* * * * *

"Q   [BY ALLEN'S ATTORNEY]:   [Juror,] can you recall now off hand how many times you might have [been] seen [by] Dr. Allen as a patient?

"A   I think it was a couple of times. I'm not sure. I think I went for a physical. And when I was having trouble with my foot I went, and she told me I had a heel spur.

"Q   I think you said that then you changed to Kaiser?

"A   That's right.

"Q   Well, this is sort of a sensitive question for me. Was the change because of any dissatisfaction with Dr. Allen?

"A   No. It was because we had an open period for our—to change, and Kaiser's rate was a lot better than the other insurance that I had.

"Q   Okay. All right. So the reason—So the fact that you are no longer a patient of Dr. Allen is no reflection in your mind on her?

"A None whatsoever.

"Q I'll put the question another way. Were you generally satisfied with the medical care that you received from Dr. Allen?

"A Yes, I was.

"Q The somewhat limited experience that you had with her, did you find her to be conscientious and caring?

"A Yes, I did.

"* * * * *

"Q We've talked a little bit about emotion, and I don't want to overdo that, but I feel compelled to ask you. Do you feel that you can set aside your natural feelings of emotion for these people and base your verdict upon your mature, considered, objective opinion?

"A I think I can."

Sean's counsel then asked a number of additional questions, none of which concerned the juror's relationship with or opinion of Allen.

1. The questions and answers here were materially different from those in *State v. Salas, supra.* In *Salas,* the juror failed to disclose a bias against the defendant's credibility, even though she had been asked whether anything would make it difficult for her to be fair to him. In that context, the juror lied when she answered, "No." In the present case, however, the juror readily disclosed that she had been treated by Allen, whom she found to be conscientious, caring, and satisfactory as a physician. Thus, she revealed a possible bias in Allen's favor that is similar to what she would have revealed had she also discussed Allen's treatment of her niece. Despite that revelation, the juror was never asked, and therefore never concealed, anything about Allen's treatment of members of her family. Neither was the juror asked whether she had any emotions, but only whether she thought that she could lay aside the emotions that counsel's questions assumed as a given. *See Turman v. Central Billing Bureau,* 279 Or 443, 450-51, 568 P2d 1382 (1977). Therefore, the juror in this case, unlike the one in *Salas,* did not conceal her previous acquaintance with a party or her possible predisposition on any issues. Accordingly, *Salas* is not controlling. The juror did not engage in misconduct during *voir dire* that was sufficient to justify

granting a new trial.[4] The trial court abused its discretion in concluding otherwise.

In her second assignment of error, Allen contends that the trial court erred when it allocated the $300,000 settlement with Beard: $225,000 to Sean, $50,000 to Angela, and $25,000 to Reid. After applying $50,000 of the settlement to Angela's $226,000 jury award, the court entered a judgment for $176,000 in her favor.

Allen argues that plaintiffs did not give the notice required by ORS 18.455 and that the settlement should have been allocated before trial. However, she waived those objections in a pretrial colloquy, where all parties were represented.

**2.** Finally, Allen argues that Reid's and Angela's shares of the settlement should be combined in order to allocate $75,000 to Angela's claim, because "the settlement of personal injury and consortium claims are considered to be a joint settlement for the purpose of setoff under ORS 18.455." She relies on *Yardley v. Rucker Brothers Trucking, Inc.,* 42 Or App 239, 600 P2d 485 (1979), *rev den* 288 Or 335 (1980), for that proposition. The case does not support the argument. In *Yardley,* we considered the procedures that a court is to follow under ORS 18.455 when one codefendant settles and the others proceed to trial and held that the court, rather than the jury, should allocate a settlement. *Yardley* did not discuss the allocation of settlement proceeds between spouses, and it did not need to, because the settlement exceeded the total of *both* spouses' verdicts.

Allen also relies on *Cavilee and Cavilee,* 21 Or App 506, 535 P2d 774 (1975). In that dissolution case, we observed that a personal injury settlement entered into by a husband and a wife for injuries to the husband only is a marital asset subject to equitable property division. 21 Or App at 512 n 3. That result tells us nothing about how to allocate settlements under ORS 18.455.

The claims of Angela and Reid were separate and distinct, so there is no basis to conclude as a matter of law that

---

[4] It is interesting to note that Angela, in whose favor a verdict was entered, did not move for a new trial, even though the same jury heard her case.

the trial court erred in allocating the money that Beard paid. We find no error in the allocation.

In case no. A47400, the order granting new trial is vacated and the case is reversed and remanded for re-entry of judgment entered December 2, 1987. In case no. A46970, the judgment is affirmed.

**RIGGS, J.,** concurring in part; dissenting in part.

I concur in the majority's resolution of the allocation of the settlement issue. As to the order granting a new trial, however, I believe that the majority has simply substituted its own judgment for that of the trial court. Because I cannot agree that the trial court abused its discretion in reaching a conclusion different from that of the majority, I respectfully dissent from that portion of the decision.

The jurors were aware from the opening remarks of counsel that the purpose of *voir dire* was to uncover any possible bias on the part of individual jurors in order that an impartial jury might be selected and a fair trial obtained. The challenged juror disclosed one possible source of bias—her own limited treatment by Allen—and reassured the court that that experience would have no effect on her deliberations. However, the juror concealed another, more troubling source of bias by failing to reveal that Allen had successfully treated her niece (or possibly her daughter) for a potentially fatal disease. The juror concealed that information from counsel, even though he asked her whether there was anything else that he should know about her before passing on her as a juror.

The specific question asked by counsel ("Anything you think I should know or [Allen's attorney] should know before we pass on you as a juror?") is susceptible of varying interpretations, depending upon the context in which it is asked. One purpose might have been to elicit other experience or knowledge of Allen's skills as a physician. The trial judge, who, unlike the judges of this court, had an opportunity to observe the *voir dire* and to assess the tenor of those proceedings, was entitled to find that the challenged juror had misrepresented her lack of bias on *voir dire* and that her misrepresentations were not materially different from those in *State v. Salas,* 68 Or App 68, 71 n 2, 680 P2d 706, *rev den* 297

Or 601 (1984). I would defer to the trial judge's considered opinion on this issue and would affirm.