Argued and submitted December 13, 1989, the decision of the Court of Appeals
affirmed and the judgment of the circuit court reversed and remanded with
instructions November 8, 1990

Sean Paul ERTSGAARD,
*Petitioner on Review,*

*v.*

Duane G. BEARD,
*Defendant,*

*and*

Amelia ALLEN,
*Respondent on Review.*

(CC 86C 10721; CA A47400; SC S36402)

800 P2d 759

J. Michael Alexander, of Burt, Swanson, Lathen, Alexander & McCann, Salem, argued the cause for petitioner on review. With him on the brief was Donald W. McCann, Salem.

Kim Jefferies, of Wood Tatum Mosser Brooke & Landis, Portland, argued the cause for respondent on review. With her on the response to the petition was David C. Landis, Portland.

Before Peterson, Chief Justice, and Linde,** Carson, Jones,*** Gillette, Van Hoomissen, and Fadeley, Justices.

GILLETTE, J.

** Linde, J., retired January 31, 1990.

*** Jones, J., resigned April 30, 1990.

## GILLETTE, J.

The issues in this medical malpractice case are (1) whether a juror's failure to reveal in *voir dire* examination that the defendant doctor had successfully treated a member of the juror's family constituted juror misconduct, and (2) whether the same juror's statements to other jurors during deliberations that the doctor had so treated others constituted juror misconduct. The trial court found both actions to be misconduct and granted a new trial. The Court of Appeals held that neither circumstance justified ordering a new trial and reversed the trial court's order. *Ertsgaard v. Beard,* 97 Or App 471, 777 P2d 971 (1989). We affirm the decision of the Court of Appeals.

### FACTS

The underlying action involves injuries suffered by a mother and child at the time of the child's premature birth. While pregnant, mother had seizures which resulted in the premature birth. Plaintiffs (mother, father and child), each in his or her own right, sued defendant doctors (Beard and Allen) for malpractice, including failing to check mother's blood pressure and failing to discover her condition in a timely manner.

The jury found Allen negligent, but it awarded damages only to plaintiff mother. The trial judge granted a motion for new trial to plaintiff child on grounds of juror misconduct. Defendant Allen appealed to the Court of Appeals, which reversed the trial court and reinstated the verdict, holding that the juror's acts did not constitute misconduct sufficient to justify setting aside the verdict. We allowed plaintiff child's petition to review the Court of Appeals' decision.

We consider the acts of alleged juror misconduct in the order in which they occurred.

### VOIR DIRE

Prior to conducting individual *voir dire* examinations of potential jurors, plaintiffs' counsel generally explained the overall purpose of *voir dire* through the following statement:

"Before I talk to you individually, I'm going to expand a little on what His Honor has said to kind of give you the idea

of this case. Now, what I want to do is to evoke in you any ideas that you may have, and when you answer either myself or [Allen's attorney] as we talk to you, be sure and tell us exactly what you think. We have no way of knowing other than that.

"Each of us knows a lot more about our case than we're able to tell you now, but we're trying to get some idea of your own feelings, perhaps any little ideas that we carry, we all have with us, because we're looking to find 12 people who have no particular feeling one way or the other about this case or this type of case. And then we'll present a lot of testimony on our respective positions. We can't assure our clients of a fair trial unless we are convinced and know that the jury really doesn't have any bias one way or the other, so we're not being nosey. That's what we're trying to do."

The specific questions and answers during *voir dire* examination of juror Barrett (the juror here in question) were as follows:

"Q [BY PLAINTIFF'S COUNSEL]: * * * Do you know anybody that's connected with [this case]?

"A When my regular family physician retired some years ago Dr. Allen took over his practice, and I saw her as a patient a couple of times before I switched over to [another health care provider].

"Q All right. Anything about that that would embarrass you or bother you in a case of this kind?

"A No.

"Q The questions here are going to be basically addressed as to whether or not Dr. Allen made a mistake, and if she did, what the results of that were. We both want 12 people who will look at it, make a decision based on the evidence, and then have the jury say what they think. Do you fit that pattern?

"A Yes, I do.

"Q All right. Now, we've talked about emotion. I think maybe we're not in complete agreement on that. I think you may be told that emotion is fine, but you're not to base a verdict on it. No one expects the jury to be a bunch of robots, but you're not to base a verdict on your emotions but only on the facts. Could you follow that?

"A Yes, I could.

"* * * * *

"Q  Anything you think I should know or [Allen's attorney] should know before we pass on you as a juror?

"A  I don't think so.

"* * * * *

"Q  [BY ALLEN'S ATTORNEY]:  [Juror,] can you recall now off hand how many times you might have [been] seen [by] Dr. Allen as a patient?

"A  I think it was a couple of times. I'm not sure. I think I went for a physical. And when I was having trouble with my foot I went, and she told me I had a heel spur.

"Q  I think you said that then you changed to [the other health care provider]?

"A  That's right.

"Q  Well, this is sort of a sensitive question for me. Was the change because of any dissatisfaction with Dr. Allen?

"A  No. It was because we had an open period for our — to change, and [the other health care provider's] rate was a lot better than the other insurance that I had.

"Q  Okay. All right. So the reason — So the fact that you are no longer a patient of Dr. Allen is no reflection in your mind on her?

"A  None whatsoever.

"Q  I'll put the question another way. Were you generally satisfied with the medical care that you received from Dr. Allen?

"A  Yes, I was.

"Q  The somewhat limited experience that you had with her, did you find her to be conscientious and caring?

"A  Yes, I did.

"* * * * *

"Q  We've talked a little bit about emotion, and I don't want to overdo that, but I feel compelled to ask you. Do you feel that you can set aside your natural feelings of emotion for these people and base your verdict upon your mature, considered, objective opinion?

"A  I think I can."

■       Although not contained in the record, we presume that all jurors, including Barrett, took an oath to give true

answers to all questions touching upon the juror's qualifications to act as a fair and impartial juror in the case. A juror's violation of such an oath would *ipso facto* constitute misconduct if a relevant untrue answer were given or a relevant fact intentionally concealed and if such misconduct prejudiced the complaining party. As this court has said, "[t]he purpose of *voir dire* is to determine the possibility of * * * prejudice." *McElwain v. Kabatoff,* 275 Or 393, 396, 551 P2d 105 (1976).

The general duty of a juror to answer *voir dire* questions and the consequences of a violation of that duty are aptly summed up in a recent ALR annotation:

> "Litigants are granted the right to examine prospective jurors on voir dire in order to enable them to select a jury composed of men and women qualified and competent to judge and determine the facts in issue without bias, prejudice, or partiality, as full knowledge of all relevant and material matters that might bear on possible disqualification of a juror is essential to a fair and intelligent exercise of the right of counsel to challenge either for cause or peremptorily. Accordingly, it is the duty of a juror to make full and truthful answers to such questions as are asked, neither falsely stating any fact nor concealing any material matter, and if a juror falsely or intentionally misrepresents his interest or situation or fails to reveal a material fact relevant to the controversy, such misconduct may be prejudicial and may be grounds for a new trial. However, whether a particular verdict will be set aside because of misstatements or concealment by a juror on voir dire examination depends upon a showing of prejudice, which is primarily a question for the discretion of the trial court when the propriety of the participation by the juror is properly raised."

Annot, *Effect of Juror's False or Erroneous Answer on Voir Dire Regarding Previous Claims or Actions Against Himself or His Family,* 66 ALR4th 509, 514-15 (1988) (footnotes omitted).

We agree with the foregoing statement of principles, which we think is the law in Oregon. *See, e.g., State v. Gardner,* 230 Or 569, 575, 371 P2d 558 (1962); *Jones v. Imperial Garages,* 174 Or 49, 145 P2d 469 (1944). The principles do not, however, justify the trial judge's decision to grant a new trial in this case.

The trial court's premise in granting a new trial on

this ground was that the juror had not answered truthfully the question, "Anything you think I should know * * * before we pass on you as a juror?" It is true that Barrett was not an epitome of candor. In fact, she believed Allen's prompt diagnosis of her relative had saved the relative's life. Certainly, it would have been proper for the prospective juror to have answered, "Yes, although no one has mentioned it, Dr. Allen also treated a relative of mine and saved her life, so I'm going to be very favorably disposed toward Dr. Allen." But we do not think that the question that *was* asked specifically *required* that answer.

Counsel in this case had a chance to follow up with the prospective juror on whether any other members of the juror's family had treated with Dr. Allen. Instead, he asked the question involved here. Some form of the question, "Anything else we should know about you?" is asked by virtually every trial lawyer who picks a jury. The question is perfunctory. While there may be times when even answers to questions like it could serve as a basis for granting a new trial,[1] we think such occasions will be very rare and this is not one of them. It follows that the trial court abused its discretion in granting a new trial on this ground, and the Court of Appeals was correct in so ruling. *See Isom v. River Island Sand & Gravel,* 273 Or 867, 543 P2d 1047 (1975) (trial court did not abuse discretion in denying new trial where jury foreman failed to disclose on *voir dire* that his company was a codefendant in a pending action and that counsel for defendant in the case before the jury was counsel for a codefendant in the other case); *Zeiszler v. Fields,* 255 Or 540, 469 P2d 34 (1970) (not error to deny new trial when juror failed to disclose she had sat on a previous case of a similar type and had been castigated by the mother of the plaintiff in that earlier case for returning a defense verdict).

## JURY DELIBERATIONS

Some jurors, unhappy with juror Barrett's conduct during deliberations, claimed that Barrett had stated during their deliberations that Allen had saved Barrett's niece by diagnosing a cancerous tumor, that Barrett had argued that a

---

[1] One example might be when the answer to the question should have been, "Yes, the defendant and I have been married for ten years."

finding of negligence would ruin Allen's reputation, and that Barrett had generally shown bias in favor of Allen. The complaining jurors brought these allegations to the attention of plaintiffs' counsel and the trial judge. Barrett disputed these allegations. The trial judge granted a new trial to plaintiff child, stating:

> "The reason I granted the motion for new trial is that from the very beginning, based upon the conduct of the one juror, when two jurors became concerned about comments that she was making that indicated that her inclinations and her feelings were pro Dr. Allen based upon some contact that acquaintances or relatives of her had had with Dr. Allen. And I thought about it a long time, and her conduct was such that it did bother and cause concern with the other jurors. And they felt that it was totally inappropriate. And, then based upon the totality of I guess what you would call the circumstances, the records of what the jury did and how they came about, I got to thinking that, in analyzing that, that her answers were not as candid as they should have been. And based upon the questions put to her, she left out that which she should have come forth with. And her conduct in the jury room was contrary to the oath that she took. And based upon the number of those that granted the judgment, because it was almost a hung jury, and so we got the verdict by one, one vote, I just felt that the situation was unfair to the plaintiff and called for granting of a new trial. It just smacked of unfairness. It wasn't the clean verdict, unbiased verdict, that it should have been. And it was a well-tried, clean case, by you people. And it was tainted by jury misconduct.

> "That's my reasons.

> "* * * * *

> "* * * I have taken in the totality of the circumstances. Taken the affidavits into consideration, the immediate concerns by the two jurors, and to me, she wasn't candid. She left out —. Her answers weren't candid, and she left out that which she should have disclosed at the time of voir dire."

No statute expressly addresses the propriety of a court's considering a juror's evidence concerning the jury deliberation process after a verdict has been returned. OEC

606,[2] for example, addresses only the competency of a juror to be a witness at trial. It does not purport to describe the circumstances in which a juror may present evidence, by testimony or affidavit, touching the validity of a verdict in which the juror participated. In contrast, Federal Rule of Evidence 606 contains a second subdivision, FRE 606(b),[3] which relates to the competency of a juror to testify about what went on during jury deliberations, not to substantive standards for setting aside a verdict.

The Oregon Legislative Assembly did not adopt FRE 606(b), or any similar rule, apparently believing that Oregon case law adequately stated the circumstances under which a court may inquire into the validity of a jury's verdict. The unofficial legislative commentary to OEC 606 states:

"The familiar rule that a juror may not impeach the juror's own verdict stems from a doctrine nurtured by Lord Mansfield in the 18th century. 8 Wigmore, *Evidence* §§ 2352, 2353 (McNaughton rev 1961). It is a simplification of several policies: (1) to prevent an invasion of the privacy of the jury room by litigants or the public; (2) to promote finality of jury verdicts; and (3) to protect jurors from annoyance, embarrassment and harassment. While these are important policies, simply putting verdicts beyond reach can only promote irregularity and injustice.

"In the most recent case of *Blanton v. Union Pacific Railroad Co.*, 289 Or 617, 616 P2d 477 (1980), the Supreme Court repeated its position that '* * * a verdict is impeachable if justice demands that it be set aside * * *', and explained:

---

[2] OEC 606 (competency of juror as witness) provides:

"A member of the jury may not testify as a witness before that jury in the trial of the case in which the member has been sworn to sit as a juror. If the juror is called so to testify, the opposing party shall be afforded an opportunity to object out of the presence of the jury."

[3] FRE 606(b) provides:

"Upon an inquiry in the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes."

" '* * * While jurors' affidavits are receivable in evidence in the sense that the trial court should permit them to be filed, affidavits which disclose nothing more than oral misconduct during the jury's deliberation cannot impeach a verdict * * * The kind of misconduct * * * that will be considered in an attack upon a verdict by a juror's affidavit * * * is misconduct that amounts to fraud, bribery, forcible coercion or any other obstruction of justice that would subject the offender to a criminal prosecution therefor. We do not necessarily use the words "fraud," "bribery," "forcible coercion," and "obstruction of justice" in a purely technical sense, but as words that denote such serious breach of the juror's duties that the trial judge would be justified in citing [the juror] for nothing less than a contempt of court * * *.' 289 Or at 631, quoting *Carson v. Brauer*, 234 Or 333, 345-346, 382 P2d 79 (1963).

"* * * * *

"The Legislative Assembly intends to discourage the practice of questioning jurors after a trial concerning their deliberations or the methods by which they reached a verdict."

Kirkpatrick, Oregon Evidence 322-23 (2d ed 1989).

In the case before us, we are not concerned with the manner in which the two jurors initially communicated to the court[4] but, rather, whether a juror's affidavit or testimony about Barrett's statements would be admissible in an effort to set aside the verdict based on Barrett's actions during deliberations and, if so, whether Barrett's conduct justified the court's action in granting a new trial. Resolving whether juror affidavits or testimony alleging misconduct justifies a new trial depends on a threshold inquiry whether "such affidavits or testimony may be received by the trial court. Only if the

---

[4] Uniform Trial Court Rule 3.120 (Communication with jurors) provides:

"(1) Except as necessary during trial, and except as provided in subsection (2), parties, witnesses or court employes shall not initiate contact with any juror concerning any case which that juror was sworn to try.

"(2) After a sufficient showing to the court and on order of the court, a party may have contact with a juror in the presence of the court and opposing parties when:

"(a) there is a reasonable ground to believe that there has been a mistake in the announcing or recording of a verdict;

"(b) there is a reasonable ground to believe that a juror or the jury has been guilty of fraud or misconduct sufficient to justify setting aside or modifying the verdict or judgment."

affidavits or testimony are admissible must we inquire whether such allegations of juror error are sufficient to warrant setting aside the verdict and ordering a new trial." *D.C. Thompson and Co. v. Hauge*, 300 Or 651, 657, 717 P2d 1169 (1986).

■ ■ We think that receiving affidavits to the effect of those produced in this case was appropriate. It is true that the affidavits could be construed, at least in part, as relating to the oral exchanges used by certain jurors in an attempt to persuade others, or to the mental processes used by jurors in reaching a verdict. To the extent they had this effect, their substance should have been ignored. *State v. Gardner, supra; Carson v. Brauer*, 234 Or 333, 382 P2d 79 (1963).

But the fact that, once examined, the contents of a juror's affidavit are not legally sufficient to justify a new trial does not mean that the affidavit was inadmissible. The limited kinds of juror misconduct enumerated in the unofficial commentary are, by their very nature, things only another juror could know. It follows that only another juror, by affidavit or live testimony, could bring such misconduct to the judge's attention. The trial judge properly considered these affidavits.[5]

Holding that the trial judge properly considered the affidavits does not end our inquiry, however. The question remains whether those affidavits disclosed misconduct that permitted the trial judge, as a matter of discretion, to order a new trial. We conclude that ordering a new trial exceeded the scope of discretion accorded to trial judges in such cases.

■ It is clear that such a decision, whether it is to grant a new trial or to deny one, is discretionary. *See, e.g., Wolfe v. Union Pacific R. Co.*, 230 Or 119, 123-24, 368 P2d 622 (1962) (order granting new trial when juror conducted unauthorized visit to locus in quo held not to be abuse of discretion); *Saunders v. Williams & Co.*, 155 Or 1, 13, 62 P2d 260 (1936) (order denying new trial was not an abuse of discretion when juror

---

[5] Affidavits or testimony of other jurors offered to challenge the verdict but based on the untruthfulness of a juror on *voir dire*, rather than on the deliberations process, present lesser concerns. The trial court's decision to consider the affidavits for such purpose was, therefore, appropriate as well, although — as previously indicated — the trial court's ruling on the *voir dire* issue was not.

made a "casual" view of the premises without fault of the prevailing party). However, the values identified in the unofficial legislative commentary strongly favor protecting jury verdicts from attack on the basis of statements made during jury deliberations. These values include freedom of deliberation, stability and finality of verdicts, and protection of jurors against annoyance and embarrassment after they have performed their duty and rendered a verdict. Only the clearest kinds of juror misconduct can trigger the trial court's right to exercise its discretion and order a new trial.

■ The misconduct claimed in this case does not meet that threshold level. Two of the improprieties attributed to Barrett — that she was "biased" toward Allen, and that she argued that a verdict against Allen would ruin the doctor's reputation — are not even colorably sufficient. The posture a juror takes for or against a party during deliberations can always be attacked as bias; no verdict would ever be safe if such a meaningless label could justify a new trial. Similarly, speculation among the jurors concerning the impact of a verdict on a party is a natural consequence of the impression that party may have made on jurors. While inappropriate in most cases (save those when, for example, punitive damages are under consideration), it is also so commonplace that it cannot be a basis for permitting a new trial. *See, e.g., Carson v. Brauer, supra,* 234 Or at 343 ("[C]ourts must recognize that when the jurors, as laymen, are by themselves in the jury room they may at times indulge in remarks of doubtful merit. The state must assume that the tongue's slip up in instances of that kind does not tilt the scales.").

■ This leaves only Barrett's specific factual allegation concerning Allen's successful treatment of Barrett's niece for a life-threatening illness. Barrett's argument was inappropriate, to be sure. But was it so inappropriate that it could serve as the basis for a discretionary decision to order a new trial?

We think not. In the relatively few cases in which this court has either permitted or required a new trial for juror misconduct that occurred during the deliberating process, we have found none in which the misconduct consisted solely of juror argument. All the cases have involved specific acts by jurors designed (and later claimed, either explicitly or implicitly) by the particular offending jurors to give them

special knowledge concerning one of the disputed facts in the case then under consideration. *See, e.g., Sanders v. Curry County,* 253 Or 578, 456 P2d 493 (1969), (unauthorized inspection of premises); *Wolfe v. Union Pacific R. Co., supra* (unauthorized visit to accident scene); *Thomas v. Dad's Root Beer, Etc.,* 225 Or 166, 356 P2d 418, 357 P2d 418 (1960) (view of accident scene and unauthorized experiment); *Eckel v. Breeze,* 221 Or 572, 577, 352 P2d 460 (1960) (view of scene); *Schneider v. Moe,* 151 Or 353, 50 P2d 577 (1935) (view of accident scene). Barrett's actions were different. She did not obtain new information relating to Allen's care for the plaintiff child. She simply disclosed the basis of her pre-existing bias. That is argument, not superior knowledge of a pivotal fact concerning some issue in the case actually being decided by the jury.

Given the state of the law at the time of the adoption of OEC 606, and given further the assertion in the unofficial commentary that "[t]he Legislative Assembly intends to discourage the practice of questioning jurors after a trial concerning their deliberations or the methods by which they reached a verdict[,]" we think it clear that actions like those of Barrett, however reprehensible, were not such as to constitute juror misconduct permitting the court to grant a new trial. The Court of Appeals was correct in so concluding.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court with instructions to reinstate the jury verdict for defendant Allen.