Argued and submitted June 22, 1999, affirmed May 3, petition for review denied August 15, 2000 (330 Or 552)

# STATE OF OREGON,
*Respondent,*

*v.*

# THOMAS GORDON MILLER,
*Appellant.*

## (95c-22786; CA A99201)

1 P3d 1047

Walter J. Ledesma, Deputy Public Defender, argued the cause for appellant. With him on the brief was David E. Groom, Public Defender.

Jennifer S. Lloyd, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Deits, Chief Judge,* and Armstrong, Judge.

ARMSTRONG, J.

---

* Deits, C. J., *vice* Warren, S. J.

## ARMSTRONG, J.

Defendant appeals several convictions for sexual offenses arising from the same incident. He assigns error to the court's denial of his motion for a new trial based on alleged juror misconduct and to the action of a disqualified judge in hearing that motion. We hold that any juror misconduct does not justify setting aside the verdict and that defendant failed to preserve the disqualification issue and there is no reason for us to review it as plain error. We therefore affirm.

Shortly after the trial, Hearn, the jury foreperson, got in touch with defendant's trial attorney and expressed concern at some of the statements that another juror, Herring, had made during deliberations.[1] Defendant's attorney thereafter received permission to communicate further with Hearn, who then testified at the hearing on defendant's motion for a new trial. Defendant's attorney did not receive permission to communicate with any other juror, and Herring did not testify at the hearing. We therefore describe the facts in accordance with Hearn's testimony.

Both Herring and her husband were prison guards. From the evidence, the jury knew that the alleged offenses occurred a day or two after defendant's release from prison on a previous conviction. Herring told the jurors that she knew defendant by sight because she saw him while he was in prison. She stated that during the trial he wore long-sleeve shirts buttoned at the top in order to cover gang tattoos and gang symbols. It is unclear from Hearn's testimony whether Herring claimed to have seen gang tattoos on defendant or merely believed from her experience that the probable explanation for his style of dress was that he was attempting to hide such tattoos. Defendant in fact has only one tattoo, on his hand, and it was visible throughout the trial. The trial court concluded, and we agree, that Herring's statements referred to tattoos on prisoners in general, not specifically on defendant.

---

[1] Hearn was the only juror to vote for acquittal on all counts. He apparently believed that Herring's actions were the primary reason that the jury convicted defendant on some of the counts.

In addition to her comments about gang tattoos, Herring told the jury a number of things about prison life and how prisoners act. She said that prisoners who get out of prison have a "power of control," a "need to put themselves in charge," that they exert in the way that defendant allegedly did. She related threats made toward her and her husband and said that inmates would threaten to get to her through her husband. She also testified that prisoners seek sexual gratification in certain ways that, according to Heard, made the victim's story in this case more believable and less bizarre. There was evidence at trial that, shortly after his release, defendant had accepted a ride from another former convict and had drunk beer. Herring pointed out that those actions violated his release conditions, something that the rest of the jury had not previously known.

Defendant argues that Herring's statements were juror misconduct that require a new trial. He does not refer to other cases with similar facts but rather argues that Herring violated the general standard stated in Uniform Criminal Jury Instruction 1002, which the court gave in modified form before the opening statements.[2] The court instructed the jurors that "the case is to be decided only on what you hear in court" and that they should not "make any independent personal investigations into any facts or any locations that are connected with this case. You should not look up any information from any source. If you discover that you have any private or special knowledge about any of the facts of this particular case, that should not be communicated to fellow jurors."

Whether to grant a new trial because of juror misconduct is a discretionary decision for the trial court.[3] *Ertsgaard v. Beard*, 310 Or 486, 496, 800 P2d 759 (1990). The evidence must, however, meet a threshold level before the

[2] We quote the court's actual instruction, which, although it modifies the wording, retains the substance of the uniform instruction.

[3] Defendant argues that we should not defer to the trial court's decision in this case because the judge who ruled on the motion for a new trial was not the judge who tried the case. Because our decision would be the same even if we accepted defendant's position in this respect, we do not need to discuss it further.

court has any discretion to exercise. In *Ertsgaard*, a juror testified on *voir dire* that she had been a patient of the defendant physician for a short time. She did not mention, however, that she believed that the defendant had saved the juror's niece's life by diagnosing the niece's cancer. Other jurors stated that, during deliberations, the juror mentioned the diagnosis, argued that a finding of negligence would ruin the defendant's reputation, and generally exhibited a bias in favor of the defendant. Based on this evidence, the trial court granted a motion for a new trial. We reversed, *Ertsgaard v. Beard*, 97 Or App 471, 777 P2d 971 (1989), and on review the Supreme Court affirmed our decision. In doing so, it held that the juror's alleged bias and her reference to the effect of a verdict on the defendant's reputation were not even colorably sufficient to justify a new trial. It noted that the posture that a juror takes during deliberations can always be attacked as bias, and that speculation among the jurors about the effect of a verdict, while generally inappropriate, is also so commonplace that it cannot support a decision to grant a new trial. *Ertsgaard*, 310 Or at 497.

The court then turned to the juror's statement about the defendant's diagnosis of her niece. It held that, although the statement was inappropriate, it could not serve as the basis for a discretionary decision to order a new trial:

"In the relatively few cases in which this court has either permitted or required a new trial for juror misconduct that occurred during the deliberating process, we have found none in which the misconduct consisted solely of juror argument. All the cases have involved specific acts by jurors designed (and later claimed, either explicitly or implicitly) by the particular offending jurors to give them special knowledge concerning one of the disputed facts in the case then under consideration."

310 Or at 497-98. The cases that the court cited all involved unauthorized visits to a relevant location or unauthorized experiments. The juror's actions in *Ertsgaard* were different: she did not provide new information relating to the defendant's actions but simply disclosed the basis of her preexisting bias. That was argument, not superior knowledge of a pivotal fact. *Id.* at 498.

We expanded on the Supreme Court's statement in a case that we decided after *Ertsgaard*:

> "There is a strong policy in Oregon to protect jury verdicts from attack. Only limited kinds of juror misconduct justify a new trial. The kind of misconduct that will be considered in an attack on a verdict is misconduct that is extrinsic to the communications between jurors during the deliberative process or that amounts to fraud, bribery, forcible coercion or any other obstruction of justice that would subject the offender to contempt of court or criminal prosecution."

*State v. Jones*, 126 Or App 224, 227, 868 P2d 18, *rev den* 318 Or 583 (1994). We noted that "[o]ur system of justice is not a perfect system, because it is administered by imperfect human beings" and concluded that, in the absence of compelling reasons that are extrinsic to the deliberation process, the law has chosen to shelter jurors from examination about their deliberations. *Id.* at 228.

Under those cases, Herring's alleged misconduct during the jury's deliberations is not of the kind that could permit the trial court to order a new trial. The jury system is based in large part on the belief that the best decisions come when jurors bring their life experiences and their methods of thought with them into the jury room. By allowing them to do so, we test the evidence by the wisdom and experience of the community as a whole. One of the inevitable consequences of that system is the possibility that jurors may improperly consider issues and approaches in their deliberations that the court would exclude if the parties formally offered them during the trial. Courts try to reduce that possibility by careful instructions and, more broadly, by the safeguards involved in choosing an impartial jury. The cases show, however, that, except for the narrow situations that we described in *Jones*, we accept that consequence rather than subject jury deliberations to a level of scrutiny that would destroy much of their value.

In this case, Herring used her experience in the corrections system to evaluate defendant's style of dress during the trial and to understand the evidence that the parties presented. In doing so she may have at times speculated more

than a juror should; she certainly reached the wrong conclusion about gang tattoos. In telling the jury that defendant had violated the terms of his release shortly after leaving prison, she gave it information that the Evidence Code would not have allowed the parties to present and that it should not have had. However, the facts that led her to that conclusion were all in evidence; she only described their legal effect. In short, Herring based all of her statements on what the jury experienced in the courtroom, using her previous experience and knowledge to interpret them. In that respect, her actions were less questionable than those of the juror in *Ertsgaard*, who brought in extraneous facts that were entirely irrelevant to the issue that the jury had to consider. Nothing that Herring said during the deliberations could support a decision to grant defendant a new trial.

■ Defendant also argues that the court should have granted a new trial because Herring lied by omission during *voir dire* when she failed to respond to the court's question about whether any juror knew defendant. He points out that during jury deliberations Herring stated that she recognized defendant from his previous incarceration. It would probably have been better for Herring to have given that information during *voir dire*. However, there is a difference between recognizing a person at a distance and "knowing" the person. Herring did not claim any personal acquaintance with defendant during the deliberations and incorrectly assumed that he had gang tattoos, which indicates that she had not had any direct contact with him. Her failure to speak up during *voir dire* is not a sufficient basis for the court to grant a motion for new trial based on juror misconduct.

■ Finally, defendant points out that Judge Barber, who heard the motion for new trial while Judge Wilson, the trial judge, was on vacation, had been disqualified from acting as a judge in the case. Therefore, defendant argues, his ruling was a nullity and there should be a new hearing before a different judge. In January 1996, Judge Barber granted defendant's motion, based on an affidavit of prejudice, to disqualify him from the case. No one mentioned that fact in August 1996, when Judge Barber heard the motion for new trial, and we presume that he had forgotten it.[4] Defendant

---

[1] The attorney who filed the affidavit of prejudice also argued the motion for a new trial.

argues both that he did not have to raise the issue for the order denying his motion to be void and that, if it is not void, then we should review the issue as error apparent on the face of the record. If the order was void, the motion was conclusively deemed denied under ORS 136.535[5] a few days later, before defendant filed his notice of appeal, which would have had the same effect as the order that Judge Barber entered. In any case, defendant does not suggest that he would have presented any different evidence if another judge had heard the motion. Thus, our conclusion that the evidence does not support the grant of defendant's motion—and, thus, that there was no occasion for Judge Barber to have exercised his discretion in defendant's favor—is sufficient reason for us to decline to exercise our discretion to review this issue, assuming that it is apparent on the face of the record. *See* ORAP 5.45(2).

Affirmed.

---

[5] ORS 136.535(3) provides:

"The motion [in arrest of judgment or for a new trial] shall be heard and determined by the court within 20 days after the time of the entry of the judgment, and if not heard and determined within that time, the motion shall conclusively be considered denied."