Argued and submitted January 28, affirmed on appeal; cross-appeal dismissed as moot June 9, 2004

Robert HILL,
*Appellant - Cross-Respondent,*

*v.*

LaGRAND INDUSTRIAL SUPPLY CO.,
an Oregon corporation,
*Respondent - Cross-Appellant.*

9905-05676; A111301

91 P3d 768

Lloyd F. Le Roy, California, argued the cause *pro hac vice* for appellant - cross-respondent. On the briefs were Elaine J. Brown, David A. Stewart,
Robyn L. Stein, Gil Purcell, and Brayton-Purcell.

I. Franklin Hunsaker III argued the cause for respondent - cross-appellant. With him on the opening brief on cross-appeal were Concetta F. Schwesinger and Bullivant Houser Bailey PC. With him on the reply brief on cross-appeal was Bullivant Houser Bailey PC.

Before Edmonds, Presiding Judge, and Wollheim and Schuman, Judges.

SCHUMAN, J.

## SCHUMAN, J.

Plaintiff brought this action for product liability and negligence (and other claims not relevant on appeal) based on his exposure to asbestos-containing products distributed and sold by defendant. The jury returned a special verdict, finding that defendant's product was defective; that it was not a substantial factor in causing plaintiff's injury; and that defendant was not negligent. Plaintiff moved for a new trial based on several instances of what he characterized as juror misconduct. The trial court denied his motion, and he appeals. We affirm.

Plaintiff's allegations of juror misconduct include charges that one juror provided the others with a dictionary definition of the term "substantial"; that at least one juror suffered "forcible coercion" by another juror; that a group of jurors engaged in deliberations out of the presence of the others; and that two jurors provided the others with personal knowledge that was not in the evidentiary record. These allegations stem from the following facts, which are not in dispute.

Before the jurors began their deliberations, the trial court instructed them on, among other things, the meaning of the term "substantial factor." During deliberations, they asked the court for access to a dictionary. The court refused and the following day informed the parties of that decision. Plaintiff's counsel then asked the court to find out what word the jury wanted to look up. He suggested that, if the word were something like "substantial," the jury should be informed that it had been instructed on the meaning of that term. The court did not conduct an inquiry; neither party objected to that decision. Instead, the parties agreed that the court would give a written curative instruction informing the jurors that they were not permitted to consult a dictionary and were to "disregard any outside information from any source and base [their] decisions on the evidence and the instructions" that the court had given them.

Shortly after giving that instruction, the court learned from the clerk that juror Halupowski had, in fact, already consulted a dictionary independently and had

reported the definition to the rest of the jury. The word that Halupowski had looked up was "substantial." Defendant moved for a mistrial. The court denied the motion and asked if the parties wanted any more information from the clerk. Both sides declined. Defendant then renewed its motion for a mistrial. Plaintiff opposed the motion, telling the court, "I think that [defendant's counsel] would make that statement about most any term that it was likely for the jury to be concerned about and that nothing is different, and we would urge the Court to deny the motion at this time." The trial court again denied the motion. Plaintiff's counsel commented to the court, "I don't know that this is in any way unusual, and I agree with your comments that it may happen quite a bit and we just don't get to hear about it as often as we might otherwise." The trial court urged both sides to "ruminate on" the decision and asked if either side wanted "to schedule something now for tomorrow[.]" Both parties declined to schedule a hearing for the next day.

At the same time that she informed the clerk that she had looked up a word in the dictionary, juror Halupowski told the clerk about the atmosphere during deliberations. The clerk reported to the court that Halupowski said that

> "there is a bully in the [jury]room, that there has been a lot of screaming going on, that it's Mr. Callopy, juror number 12, that tries to pressure people into changing their votes. She is basically sick of it, and doesn't know what to do, if the court can intervene at all."

Another juror, Ms. Giese, also spoke to the clerk, who reported that, according to Giese,

> "there is a bully in the [jury]room. It's Mr. Callopy, * * *. [Giese] also relayed that Ms. Halupowski and Mr. Callopy are kind of mirror images of each other; that Ms. Halupowski is also a bully, and they are opposed on the issues and kind of just go at each other. That she is to the point where the yelling and the pressure in the jury room [are] making her physically ill."

The following day, the jury returned its verdict. According to the presiding juror, the jury unanimously found that defendant's product was defective, but it also found by a vote of 10 to 2 that the product was not a "substantial factor"

in causing plaintiff's injury and by a 9 to 3 vote that defendant was not negligent. A jury poll confirmed those vote totals. After the court discharged the jury, but before the jurors dispersed, Halupowski asked the court if jurors were allowed to talk to the attorneys; the court responded that they could do so only if the jurors initiated the contact.

Some time thereafter, Halupowski and Giese contacted plaintiff's counsel. Conversations apparently ensued, and on May 24, 2000, approximately three weeks after the jury had been discharged, plaintiff filed a motion for new trial supported by affidavits from Halupowski and Giese. Both affidavits indicated that other jurors, particularly Callopy, had engaged in "bullying" behavior, including shouting, "screaming, verbal assault, harassment and repeated intimidation." The affidavits also recited that a dictionary had been consulted, that some jurors had conducted private deliberations, and that two jurors had imparted their own knowledge or expertise rather than relying on the evidence. Plaintiff argued that these actions amounted to juror misconduct warranting a new trial. The court disagreed and denied the motion. This appeal followed.

■ Plaintiff first contends that the trial court should have granted the motion for a new trial because a juror consulted a dictionary and reported her finding to the other jurors. However, after the parties learned of that occurrence and that the word the juror defined was "substantial," and after defendant moved for a mistrial, plaintiff opposed the motion; he also declined a further opportunity to be heard on the matter after "ruminating on" the issue overnight. Any error regarding that juror conduct was, therefore, invited; plaintiff is not entitled to relief. *Kentner v. Gulf Ins. Co.*, 298 Or 69, 73, 689 P2d 955 (1984).[1]

We turn to the allegations involving forcible coercion, separate deliberations, and the use of personal knowledge.

---

[1] Plaintiff's actions could be characterized in several ways, all fatal to his argument concerning the juror's use of a dictionary. By not moving for a mistrial at the time or joining defendant's motion, plaintiff waived his objection. By opposing defendant's motion, plaintiff invited error. And by only later moving for a new trial, plaintiff failed to make a timely objection.

██ Under ORCP 64 B(2), juror misconduct that materially affects the substantial rights of a party is grounds for a new trial. We review the denial of a motion for a new trial on that basis for abuse of discretion. *Herron v. Grewe*, 183 Or App 485, 487, 52 P3d 1106 (2002). The question before us, therefore, is not whether the alleged misconduct would justify ordering a new trial but whether it was so egregious that ordering a mistrial was the court's only lawful option. Further, to prevail, plaintiff must overcome not only that deferential standard of review but also the powerful policy considerations that militate against impeaching a jury verdict on the basis of juror affidavits. *State v. Gardner*, 230 Or 569, 574, 371 P2d 558 (1962). The policy stems from

> "the necessity of giving finality to litigation. If verdicts could be readily set aside there would be an open invitation to disappointed litigants and their counsel to contest the verdict. The invitation would carry in its wake the temptation to tamper with jurors and it would open the way for pressures and fraudulent practices to induce members of the jury to repudiate their decisions."

*Id.* at 574-75 (footnotes omitted); *accord Ertsgaard v. Beard*, 310 Or 486, 497, 800 P2d 759 (1990); *State v. Cheney*, 171 Or App 401, 415-16, 16 P3d 1164 (2000), *rev den,* 332 Or 316 (2001).

■ Therefore, misconduct must be extremely serious to warrant a new trial. As the Supreme Court has noted,

> "The affidavit of a juror concerning utterances of other jurors during the deliberations or at any other material time cannot warrant the impeachment of a verdict. The kind of misconduct of a juror that will be considered in an attack upon a verdict by a juror's affidavit * * * is misconduct that amounts to fraud, bribery, forcible coercion or any other obstruction of justice that would subject the offender to a criminal prosecution therefor. * * * When this court said in the Gardner case that affidavits by jurors may impeach verdicts where there was misconduct of such a serious nature as to have deprived a party of a 'fair trial,' the words 'fair trial' may perhaps mislead some one. The quoted term takes the emphasis away from the word 'serious.' * * * The overriding policy of the law in this respect is to favor the finality of the verdict as *State v. Gardner* points

out. Obviously, this policy would be frustrated if affidavits concerning conversations in the jury room are to be examined to see whether or not a trial was fair. Conversations in the jury room * * * are irrelevant. The abstract fairness of such conversations is equally irrelevant. Except for the kind of criminal misconduct which we described, the risk of extraneous and improper conversation that may or may not find its way into a jury's deliberation is simply a risk that litigants assume when they submit their disputes for determination by the jury system."

*Carson v. Brauer*, 234 Or 333, 345-46, 382 P2d 79 (1963); *accord Blanton v. Union Pacific Railroad Co.*, 289 Or 617, 630-31, 616 P2d 477 (1980); *Ertsgaard*, 310 Or at 497; *Faverty v. McDonald's Restaurants*, 133 Or App 514, 529, 892 P2d 703 (1995).

■ Thus, juror affidavits alleging misconduct are sufficient to warrant a mistrial only if they establish misconduct that amounts to a criminal obstruction of justice such as fraud, bribery, or forcible coercion. Here, none of plaintiff's allegations describes conduct that amounts to fraud or bribery. They do, however, allege "forcible coercion," more particularly described as verbal assaults, intimidation, verbal harassment, and threats. Juror Halupowski's affidavit makes the following assertions:

"The foreman permitted forcible coercion from 'no' voters that included yelling at me and others who they disagreed with. In contrast, those jurors who considered case evidence for [plaintiff] were cut off and silenced, prevented from exchanging or deliberating their views of the evidence.

"[Juror] Callopy made verbal attacks and assaults towards me many times during the deliberation process. I reported this 'bullying' tactic to the bailiff despite intimidation from Mr. Callopy. Mr. Callopy yelled at me and several other jurors to the point where several jurors were brought to tears on several occasions. The foreman * * * was in agreement with Mr. Callopy and did nothing to stop this behavior.

"* * * * *

"At the end of the day Tuesday, May 2, 2000, the jury voted by a show of hands 10 'no' and 2 'yes' on Question 2 of the Product Liability Verdict Form. [Juror number six] did

not understand the question being voted on and [Juror] Giese was visibly intimidated by other jurors screaming at her when this initial vote was taken by show of hands. The following morning a secret vote was taken and 4 people indicated that their vote was 'yes' to Question 2 of the Product Liability Verdict Form with 1 abstention. [Juror] Callopy screamed that the show of hands was final and declared that no more deliberation should be allowed on Question 2. The foreman refused to allow any changes or further deliberations and justified keeping the 10-2 count by a simple majority vote of 7 in favor, 4 against and 1 abstaining vote.

"Intimidation and forcible coercion played a major role in the voting process. Proper deliberation consistent with the judge's instructions did not take place in this case."

Juror Giese's affidavit makes the following statements relating to forcible coercion and bullying:

"Four jurors began the deliberations with the inflexible position that they were 'firm "no" votes.' This was before deliberating began. [Juror] Callopy was so adamant in his position that he would yell and bully those who disagreed with him. I was harassed, forcibly coerced and threatened when I did not vote with the 'no' votes.

"I was made physically ill by the forcible coercion that took place in the jury room during deliberations, which included screaming, verbal assault, harassment and repeated intimidation. On May 3, 2000, I reported to the bailiff that I was being made physically ill by this, but I was left in the jury and no relief or changes in the situation occurred.

"* * * * *

"[Juror] Callopy verbally berated several jurors, including [juror] Halupowski, who disagreed with him. He took the inflexible position that 'substantial factor' meant 'the substantial factor' and that only if [defendant's] asbestos constituted 51% or more of the asbestos encountered by [plaintiff] during his lifetime would [defendant] be liable to [plaintiff] for his injuries. The majority of jurors refused to read the jury instructions to examine, consider, or be guided by the instructions that referenced 'substantial factor.' The bullying and verbal harassment over the meaning

of 'substantial' by [juror] Callopy was followed by introduction of a dictionary definition of 'substantial' into deliberations. The yelling and verbal assaults of Mr. Callopy intensified after this incident.

"The foreman, * * * Blackwell, conduct[ed] the voting process to the unjust advantage of the 'no' votes. Specifically, at one point in the deliberations, the jury voted 'no' as to question Number 2 on the Product Liability Verdict Form. At the end of the day on Tuesday, May 2, 2000[,] a show of hands was conducted with a count of 10 'no' and 2 'yes.' Returning the next morning, [juror] Ocampo indicated that he wanted to change his position to 'yes' and I also said that I wished to change my vote to 'yes.' The foreman refused to allow us to change our positions and instead took a hand vote to accept the prior day's count by a simple majority of less than 9 jurors. There was coercion and intimidation involved in this show of hands. Jurors were not given the opportunity to deliberate further on the question nor engage in a proper consideration of the case evidence.

"It was my understanding that in no way could I leave this deliberation unless a 9-3 verdict was returned. It was because I felt physically ill, intimidated, verbally assaulted and harassed that I did not vote my conviction and was prevented from voting 'yes' to Question 2 of the product liability verdict form. It was my understanding that only by voting 'no' would there be any way to get through with the case. The vote does not represent my decision based upon the case evidence."

The question before us is whether these affidavits allege facts that amount to obstruction of justice. *Carson*, 234 Or at 345. Although the jury misconduct cases using that term do not explicitly refer to a statutory source, we nonetheless find instructive the definition of "obstructing governmental or judicial administration" in ORS 162.235:

"(1) A person commits the crime of obstructing governmental or judicial administration if the person intentionally obstructs, impairs or hinders the administration of law or other governmental or judicial function by means of intimidation, force, physical or economic interference or obstacle."

In order to preserve the constitutionality of the statute, we have held that "intimidation" means "intentionally placing another in fear by threats to commit a crime." *State v. Mattila*, 77 Or App 219, 225, 712 P2d 832, *rev den*, 301 Or 77 (1986). Leaving open the possibility that, in some circumstances, conduct falling short of the statutory crime could amount to misconduct sufficient to justify a mistrial, we conclude that, at least in the present case, in order for one of the juror's instances of purely verbal misconduct to constitute "forcible coercion" so as to warrant a new trial, that conduct must have intentionally obstructed, impaired, or hindered the jury's function by means of placing a juror in fear by threatening to commit a crime that affected the juror in some fashion. That conclusion, in addition to conforming to precedent and relevant statutes, has the advantage of drawing a relatively bright line (unlike, for example, a rule that misconduct occurs when a juror's independent judgment is overborne), thereby minimizing the number of ambiguous situations in which parties might be tempted to "annoy[ ] and embarras[ ]" jurors "after they have performed their duty and rendered a verdict." *Erstgaard*, 310 Or at 497.

Nothing in the jurors' affidavits suggests that any juror engaged in physical violence or force. Nor can we say that the affidavits establish that the oral conduct of which the jurors complained made them fearful that one of the "bully" jurors would engage in criminal acts to their detriment. As the proponent of the position that such misconduct occurred, and given our standard of review, plaintiff had the burden of alleging facts (as opposed to conclusory assertions) from which a judge could not lawfully draw any other conclusion. In sum, although we should not be understood as condoning the conduct that some jurors allegedly engaged in, we conclude that plaintiffs have not established that the conduct amounted to physical force, threats of criminal acts, or any other behavior that constitutes obstruction of justice.

■  Further, although both jurors alleged in their affidavits that other jurors were denied the opportunity to change their votes, we need not decide whether that fact, if true, would compel a mistrial. That is so because the judge polled the jury, instructing as follows:

"When I say: Is this your verdict, what I mean is: Do you support the 'no' answer to this verdict, and your answer to me will be either 'yes' or 'no' * * *. [I]f you agree with the 'no' answer, you tell me, 'Yes, I agree with that.' If you disagree with the 'no' answer, you tell me, 'No, I disagree. That is not what I thought. That is not my verdict.' "

The poll supported the verdict form. We therefore conclude that the votes recorded on the verdict form reflected the uncoerced final decision of each juror. The trial court did not abuse its discretion in denying the motion for a new trial on the basis of forcible coercion.

Likewise, plaintiff's allegation that the jury engaged in private deliberations does not allege anything more than oral misconduct. Plaintiff cites ORCP 59 C(5) and (6), which provide that the jury must be kept together during deliberations and may be separated during deliberations only "when the court is of the opinion that the deliberations process will not be adversely affected. In such cases the court will give the jury appropriate cautionary instruction." The cited authorities indeed suggest that a jury should not be separated during deliberations. The juror affidavits, however, do not allege that the jury was separated. Rather, they allege that some members of the jury had discussions without including other members. Apparently, jurors Halupowski and Giese personally observed these discussions, but nothing indicates that they overheard them or had any way of knowing their subject. In any event, the affidavits do not allege the kind of criminal misconduct described in *Carson*. The trial court acted within its discretion in denying the motion for a new trial on that ground.

■ Finally, the trial court was not required to grant a new trial based on the allegations that two jurors divulged and relied on preexisting knowledge rather than the evidence. According to the juror affidavits, one juror, a nurse, proclaimed during deliberations that the type of cancer plaintiff had, small-cell carcinoma, was caused by smoking, not asbestos. The affidavits also recounted that another juror, identified in one of the affidavits as an x-ray technician, declared that plaintiff's chest x-ray showed the presence of a surgical clip, not pleural plaques. Again, this amounts to no

more than oral misconduct, and it is supported only by "affidavits concerning conversations in the jury room," which the *Carson* court has declared irrelevant. In any event, there are numerous cases in which Oregon appellate courts have rejected arguments for a new trial based on jurors' introduction of private knowledge outside the evidentiary record. *See, e.g., Ertsgaard*, 310 Or at 497 (juror's statements about her knowledge as a patient of the defendant physician); *Carson*, 234 Or at 347-48 (discussions between jurors about experiences of similar circumstances); *State v. Miller*, 167 Or App 72, 74-78, 1 P3d 1047 (juror's statements about the defendant's prison attire, conduct, and gang tattoos, made by juror who was a prison guard); *State v. Morrow* 158 Or 412, 431, 75 P2d 737 (1938) (osteopath-juror's opinion, expressed during deliberations, that the defendant had fathered the victim's child). The trial court did not abuse its discretion in denying the motion for a new trial on that ground.

None of the communications of which plaintiff complains was serious enough to require granting his motion for a new trial. "If judgments are to terminate controversies and provide finality, the deliberations of juries must be insulated from examination for anything but misconduct that amounts to a serious and flagrant breach of a juror's duties, such as criminal obstruction of justice." *Leland Properties v. Burton Engineering and Survey*, 152 Or App 557, 563, 954 P2d 851 (1998) (citing *Carson*, 234 Or at 342-43). Accordingly, we affirm the judgment of the trial court.[2]

Affirmed on appeal; cross-appeal dismissed as moot.

---

[2] Because we affirm, we need not discuss defendant's cross-assignment of error or cross-appeal.